DIAMOND "D" CONSTRUCTION CORP., Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF LABOR ("DOL") BUREAU OF PUBLIC WORKS; James J. McGowan, Commissioner of Labor of the State of New York; Department of Audit and Control, State of New York; Michael O'Connell, Department of Audit and Control, State of New York; County of Erie; Nancy Naples, Erie County Comptroller; Ronald Kinn, Individually and in His Capacity as Public Work Wage Investigator Employed By the DOL; Dale Stanley, Individually and in His Capacity as an Employee of the DOL; Brian Robison, Individually and in His Capacity as Senior Public Wage Investigator Employed By the DOL; Defendants.

No. 00–CV–335C.

United States District Court, W.D. New York.

Jan. 5, 2001.

Napier, Fitzgerald & Kirby (Brian P. Fitzgerald, of Counsel), Buffalo, NY, Killeen & Killeen LLP (Henry W. Killeen, III, of Counsel), Orchard Park, NY, for Plaintiff.

Eliot Spitzer, Attorney General of the State of New York (Pico Paul Ben–Amotz, Assistant Attorney General, of Counsel), New York City, for Defendant New York State Department of Labor.

Frederick A. Wolf, Erie County Attorney (George Michael Zimmermann, Assistant County Attorney, of Counsel), Buffalo, NY, for Defendant Erie County.

## INTRODUCTION

CURTIN, District Judge.

By a complaint filed April 21, 2000, plaintiff Diamond "D" Construction Corp.

commenced this section 1983 action against the New York State Department of Labor ("the DOL"); James J. McGowan, the DOL's Commissioner ("the Commissioner"); Michael O'Connell, a supervisor with the New York State Comptroller's Office ("O'Connell"); Erie County; Nancy Naples, the Erie County Comptroller; Ronald Kinn, a DOL Public Works Wage Investigator; Dale Stanley, a DOL employee; and Brian Robison, a Senior Public Works Wage Investigator for the DOL. Together with its complaint, plaintiff filed a motion for a preliminary injunction. Item 2. By an order dated June 29, 2000, the court denied Diamond D's motion for a preliminary injunction. Item 34.

However, Diamond D moved for reconsideration and reargument in July 2000. Item 39. By an order dated August 17, 2000, the court modified its order of June 2000 and scheduled evidentiary hearings regarding the issues raised by Diamond D's present motion. Item 48. Specifically, the court directed the parties to present evidence regarding two related legal issues:

(1) [W]hether this court should enjoin the DOL's administrative proceedings because the DOL has acted in bad faith, with an intent to harass and punish Diamond D, and (2) whether the DOL's investigation and proceedings represent a violation of Diamond D's constitutional right to substantive due process.

Item 48, pp. 17–18. Accordingly, hearings were held on August 22, 23, and 24, 2000, and again on September 5, 6, and 12, 2000.

## LEGAL BACKGROUND

Article I, § 17 of the New York State Constitution provides that laborers, workmen or mechanics in the employ of a public works contractor must be paid the rate of wages prevailing in the same trade or occupation in the locality within the State where the public work is to take place. *See* Labor Law § 220(3). Article 8 of the New York State Labor Law (the "prevailing wage law") implements this requirement of the State Constitution.

The Commissioner of the DOL is entrusted with the responsibility of enforcing compliance with the prevailing wage laws. *See* New York State Labor Law §§ 220(7), 220–b. The Commissioner, in turn, delegates the task of enforcing the prevailing wage law to the DOL's Bureau of Public Works ("the Bureau"). When the Bureau receives a complaint from a worker on a public works project, it investigates whether the contractor has underpaid the complainants, and indeed, any of its workers in violation of the prevailing wage law. The Bureau may also commence an investigation on its own initiative, without employee complaints. *See* New York State Labor Law §§ 220(7), 220–b(2)(c).

The prevailing wage law requires contractors to maintain accurate payroll records which detail the hours and days worked by each worker, the worker's occupation, or classification, and the hourly wage rate and proof of supplements paid. Labor Law § 220(3–a)(a). Said records must be produced to the Commissioner upon written request within five days. *Id.* The contractor is required to subscribe and affirm the payroll records as true under the penalties of perjury, as may be deemed necessary to adequately enforce the provisions of this article. *Id.* Where a contractor fails to produce such records, the Commissioner may withhold up to twenty-five percent of the contract price, not in excess of $100,000, from funds due the contractor until the Commissioner's request for records is satisfied. Labor Law § 220(3–a)(c).

When a contractor refuses to produce records or provides inadequate or inaccurate records, the DOL often uses the best available evidence to determine the contractor's underpayments to employees, even though these inferences are approximate in nature. *See e.g., Alphonse Hotel Corp. v. Sweeney,* 251 A.D.2d 169, 674 N.Y.S.2d 351 (1st Dept.1998). When these alternate methods are employed by the DOL, courts have held that the burden shifts to the employer to negate the reasonableness of the Commissioner's calculations. *See Georgakis Painters Corp. v. Hartnett,* 170 A.D.2d 726, 728, 565 N.Y.S.2d 863 (3d Dept.1991).

Once a prevailing wage investigation has been completed, the Commissioner may issue a notice to the financial officer of the appropriate public body involved to withhold from any payment due the contractor sufficient money to satisfy the unpaid wages or supplements that "appear to be due" laborers, mechanics or workmen, interest, and any civil penalty that may be assessed. Labor Law § 220–b(2)(a), § 220–b(2)(a)(1).[1] The Commissioner may cross-withhold funds on different public works projects where there are insufficient funds on the involved project to satisfy unpaid wages, supplements, and interest at the rate provided herein, and any civil penalty that may be assessed as provided herein, pending a final determination. *Id.* The money withheld is for the "sole and exclusive benefit of the workers employed on said public improvement ... and shall not be used for any other purpose except upon court order." Labor Law § 220–b(2)(b). Said monies are held and may not be released pending a final determination, including review by the appellate division. Labor Law § 220–b(2)(a)(1), § 220–b(2)(b).

In addition, section 220–b(2) of the Labor Law mandates that interest be withheld and assessed on any underpayments at the rate then in effect as prescribed by the Superintendent of Banks pursuant to Section 14–a of the Banking Law, per annum. Section 14–a establishes interest at the rate of sixteen percent. Section 220–b(2) of the Labor Law also provides for the imposition of a civil penalty in an amount not exceeding twenty-five percent of the total amount found to be due. The amount assessed in interest and civil penalty are not final and may be adjusted by counsel for the Department of Labor, the administrative hearing officer, the Commissioner or the Appellate Division. *See* Labor Law § 220–b(2)(factors for imposition of rate of interest and civil penalty); *Passucci Gen. Constr. Co. v. Hudacs,* 221 A.D.2d 987, 633 N.Y.S.2d 903 (4th Dept. 1995)(rate of interest adjusted in an article 78 proceeding).

Courts have held that the State's interest in ensuring the payment of prevailing wages is sufficiently important to justify the withholding of funds pending the outcome of the investigation and hearing process. *See Cayuga–Onondaga Counties v. Sweeney,* 89 N.Y.2d 395, 654 N.Y.S.2d 92, 95, 676 N.E.2d 854 (Ct.App.1996). Further, such pre-hearing withholdings have been upheld as constitutionally valid since State law gives aggrieved contractors access to judicial review of the DOL's withholdings. *See Hellenic American Neighborhood Action Comm. v. City of New York,* 101 F.3d 877 (2d Cir.1996) (availability of article 78 review satisfies post-deprivation hearing due process standards).

When funds are withheld pursuant to Labor Law § 220–b, that section pro-

---

1. A public works contractor's supervisors are also required to be paid the prevailing rate of wages and supplements for work performed upon a public works project. *Agency Constr. Corp v. Hudacs,* 205 A.D.2d 980, 613 N.Y.S.2d 974 (3d Dept.1994). Thus, the law also permits the DOL to withhold money for supervisors that performed "covered" work.

vides the relevant procedural provisions, rather than Labor Law § 220. Labor Law § 220–b(2)(c) mandates the Commissioner conduct his investigation and hearing "expeditiously." The expeditious language of the prevailing wage law is directive and not mandatory in nature. *See Nelson's Lamp Lighter's, Inc. v. New York State Dep't of Labor,* 267 A.D.2d 937, 701 N.Y.S.2d 681 (4th Dept.1999).

If it appears after the investigation that a contractor failed to pay prevailing wages to its workers and the Commissioner consequently directs sponsoring agencies to withhold funds otherwise owed to a contractor, the Commissioner must then give the contractor notice of the facts disclosed in the investigation and also must conduct a hearing to determine whether there have been underpayments. *See* Labor Law § 220–b(2)(c); *see also* Labor Law §§ 220(7) and 220(8) (applicable for investigations not involving withholdings). Here, the DOL notified Diamond D in May 2000 of hearings to be held in July 2000. Those hearings are on-going.

Where a contractor or subcontractor is found liable for a violation of the prevailing wage law, said aggrieved party may appeal that finding by way of a proceeding for review pursuant to Article 78 of the CPLR. Labor Law § 220–b(2)(e); *see also* Labor Law § 220(8). Such proceeding shall be commenced directly in the appellate division of the supreme court. *Id.* An Article 78 proceeding before the appellate division of the State of New York affords a contractor the opportunity to raise constitutional challenges to the DOL's investigation and hearing process. *See Solnick v. Whalen,* 49 N.Y.2d 224, 230–232, 425 N.Y.S.2d 68, 401 N.E.2d 190 (1980).

## FACTUAL BACKGROUND

Plaintiff Diamond D is a construction company that builds roads for public entities like New York State and Erie County. Item 7, ¶ 14. Over the last several years, plaintiff Diamond D has been the general contractor for road construction projects on Greiner Road, Heim Road, Main Street, and Sweet Home Road (all of which are in Erie County). The New York State Department of Transportation ("NYS DOT") was the "sponsoring agency" on the Heim Road and Main Street projects, *see* Item 7, Exhs. F and S, while the Erie County Department of Public Works was the sponsoring agency for the Greiner Road and Sweet Home Road projects, *see id.* Exh. T and Item 19, p. 4. Diamond D has not yet been paid for work it has completed on these contracts because of its alleged violations of New York's prevailing wage laws. *See supra.*

Joseph DiPizio is Diamond D's principal. Leo Hopkins and John Gorski are sons-in-law of Mr. DiPizio. *See* Item 7, ¶¶ 72–79. Hopkins works for Diamond D as a jobsite supervisor, and Gorski serves as an off-site driver.

Defendant Ronald Kinn ("Kinn") has worked as a wage investigator for the DOL's Bureau of Public Works since October 1992. Tr. 6–7. Before becoming an investigator with the DOL, Kinn had worked in construction as an ironworker. Tr. 261. After he was injured on the job in March 1989, the DOL hired Kinn as a public works wage investigator in 1992. *Id.* at 262. The DOL did not provide Kinn with any formal training for this job, such as a basic accounting course. Kinn received only on-the-job training when he was assigned to accompany an experienced wage investigator into the field. *Id.* Furthermore, Kinn was not required to familiarize himself with the Public Works Bureau's Manual on how wage investigations should be conducted, and, prior to this litigation, had never actually reviewed this Manual's contents. Tr. 225–26. Kinn be-

gan looking into Diamond D's compliance with the prevailing wage laws some time in early 1998. He testified that this investigation was the most complicated and extensive one that he had conducted. The choices that Kinn made throughout his investigation of Diamond D factor prominently in this dispute.

The following is a brief description of witnesses who testified. Harley Wendel has worked with the NYS DOT for 34 years, seventeen of those as an engineer-in-charge of various public works contracts. Tr. 827. The DOT's engineers-in-charge oversee the work being performed at public works job sites. Wendel was the engineer-in-charge of Diamond D's Main Street contract.

Steve Savidge has been employed by the NYS DOT for six years as a field inspector. Tr. 922. DOT inspectors work in conjunction with engineers-in-charge and assist in overseeing work being performed for the DOT. Savidge was an inspector on the Main Street contract, and an inspector on the Heim Road project. Tr. 923.

Paul Clark offered testimony regarding Kinn's auditing methodology. Prior to these hearings, Clark also submitted two affidavits regarding the financial effect that the withholdings were having on Diamond D. Items 5 and 24. Paul Clark is a certified public accountant, a specialist in construction contracts and accounting, the Supervisor of the Town of West Seneca, and its former comptroller. Clark is a member of the Construction Exchange of Western New York and served on its Board of Governors from 1988 to 1994. Tr. 764. Clark is experienced with prevailing wage rates on construction projects because he has represented the Town of West Seneca on such projects. Tr. 765. Clark also serves as President of the Board of Managers of one of the largest sewer districts in Western New York, Erie County One, which oversees anywhere from five to twenty-five million dollars of construction per year. Tr. 765. Finally, as the chief elected official of the Town of West Seneca, Clark administers public construction projects. Tr. 766.

John Loughlin, a senior attorney with the DOL, represents the DOL in various matters before administrative review boards and State courts. Tr. 503–04. Loughlin represents the DOL in prevailing wage hearings, which are held before DOL hearing officers. Tr. 505. Loughlin is the attorney responsible for the Diamond D prevailing wage hearings which are still ongoing at the DOL's offices here in Buffalo, New York.

Thomas Wisnowski was an employee of Diamond D Construction Corp. from 1988 until September 1998. Tr. 855. In April 1998, Kinn spoke with Wisnowski at the Main Street job site. Tr. 73. Wisnowski testified at the hearings held before this court in August and September 2000.

Finally, Edward McMahon testified about Diamond D's efforts to bond off the underpayment withholdings at issue here. McMahon is employed by Michael Guastella & Associates, an insurance agency, whose clients include Diamond D. In his work, McMahon obtains bonding for a number of contractors. Tr. 962. McMahon and his agency have secured bid bonds for Diamond D, which have guaranteed that if Diamond D is the low bidder, it will enter into the contract for the price bid. Tr. 964–65.

In addition to the foregoing witnesses, there were several other individuals who did not testify but who have played significant roles in the underlying facts.

Sal Masucci worked for Diamond D throughout the 1990s. Masucci worked on the Heim Road, Greiner Road, and Main Street contracts. In the course of his

investigation, Kinn interviewed Masucci in September 1998. Masucci gave Kinn his annual calendars for a number of years, where Masucci tallied the number of hours he worked each day, and also gave Kinn many of his pay stubs from Diamond D. P–45.

Donald Nunweiler worked for Diamond D on the Heim Road and Main Street projects. In 1997, Nunweiler filed a wage complaint in connection with his work on the Main Street contract. Kinn interviewed Nunweiler in March 1998. P–7 & Tr. 95.

Thomas Kearns worked for Diamond D on the Greiner Road, Heim Road, and Main Street contracts. In April 1998, Kearns filed wage complaints concerning all three of the projects he had worked on for Diamond D. Tr. 14–15; P–12, 13, 14. Kearns attached his pay stubs to his complaints. Tr.81 and P–13.

The following three witnesses-Ignatowski, Dorobiala, and Stahley-were employed by the sponsoring agencies on the Greiner and Heim Road projects. However, the State did not call any of them as witnesses. Since the State failed to call them, the court will presume that they would have agreed with the testimony of Wendell and Savidge and testified favorably for Diamond D.

Geoffrey Ignatowski was the engineer-in-charge for the Greiner Road project. P–32.; Tr. 119. Kinn discussed Diamond D's operation on the Greiner Road project with Ignatowski in July 1998. D–307 (Entry of 7–23–98); P–32, pp. 2–5. Ignatowski did not testify at the hearings.

Jerry Dorobiala was the DOT's engineer-in-charge of the Heim Road project. Kinn spoke with Dorobiala in early June 1998. P–1/D–307; Tr. 101, 290; P25, P–160. Among other things, Kinn and Dorobiala discussed the daily engineer's logs.

Tr. 104; P–160. DOL failed to call Dorobiala as a witness.

Dan Stahley was a DOL inspector on the Heim Road job. Tr. 113. Kinn met with Stahley in late June 1998 to discuss the work that Diamond D had performed on Heim Road. Like Ignatowski and Dorobiala, the DOL did not call Stahley as a witness.

## PRELIMINARY FINDINGS OF FACT

Both the law and the facts of this case require careful consideration. In a very short period of time, the parties have managed to develop a substantial record. Therefore, the court has set forth its preliminary findings of fact in great detail.

### I. The Bureau's Manual

As a threshold matter, it is important to note that the Bureau of Public Works maintains a manual for its workers ("the Manual"). P–202. The Manual provides, among other things, a code of conduct for the Bureau's staff, *id.* (Item No. 4002), guidelines on how to conduct a wage claim investigation, *id.* (Item No. 4070), guidelines on how to process wage claims and underpayments, *id.* (Item No. 4078), and guidelines on how to apply interest and civil penalties to withheld funds, *id.* (Item No. 4080).

In relevant part, the Manual's code of conduct states: "Investigators should maintain accurate notes covering the investigation, as they may be called upon to testify at some future time. Notes prepared during the investigation belong in the file, and may be used to refresh the recollection of the witness." P–202, Item No. 4002, p. 2.

Furthermore, the Manual suggests a number of techniques for use in wage claim investigations, among them: (i) verify that prevailing wage rates are posted at

the job site; (ii) examine payroll records in order to determine whether proper wages and supplements are being paid; (iii) examine payroll records to verify that workers are being paid for the correct classification of work they perform; (iv) examine time books to determine if workers are working more than five days a week, more than eight hours a day, and/or working Saturdays and holidays; and (v) "check with randomly selected workers to determine whether or not the wages and supplements reported by the contractor ... are actually being paid ...." P–202, Item No. 4070, pp. 2–4.

The Manual does not, however, suggest that wage investigators should rely on the records kept by the on-site officials, such as engineers or inspectors, from the project's sponsoring agency (so-called "agency records").

Immediately after an investigator receives an "Individual Claim for Wage and/or Supplement Underpayment," the Manual directs the investigator to "visit the project site and ... investigate fully the claims and allegations concerning non-payment or underpayment of the prevailing wage rate, appropriate rate of pay for job classification, etc., and interview employees to corroborate payroll records to ascertain whether or not prevailing wages are being paid ...." P–202, Item No. 4078, p. 7.

## II. DOL's Delays

DOL received the first wage complaints against Diamond D in June 1997. P–2 & P–3. The complaints from Donald Nunweiler alleged underpayments from May and June 1997. P–2. The complaint from James Higgins alleged underpayments dating back to May 1996. P–3. Supervisors at the Bureau of Public Works did not assign the Diamond D file to Kinn until February 25, 1998, approximately eight months after the complaints were first received. Tr. 62–63. Kinn did not start working on the file until March 24, 1998. Tr. 63.

These delays allowed Kinn to add several months of interest to the withholdings, since the law states that interest should be calculated from the date of alleged underpayment. *See infra* Preliminary Findings of Fact.

Although Kinn referred his files to Albany in October 1999, Tr. 303, the DOL did not issue a hearing notice until May 2000, which was about a month after Diamond D commenced the present litigation. The DOL has offered no credible explanation as to why it did not serve the Notice of Hearing until May 2000. This eight month delay between the end of the investigation and the notice of hearing added another seven months of 16 percent interest to any underpaid wages that are ultimately found. From this history it is not unfair to conclude that if Diamond D had not filed the present action, then the DOL would have only further delayed issuing a notice of hearing.

The DOL has implied that Diamond D sat on its rights, since Diamond D could have contacted the DOL between November 1999 and May 2000 and demanded that a hearing be scheduled sooner. However, Diamond D insists that it could not have demanded a hearing until it had access to the information and documents it would need to form a defense. Indeed, the record reveals that Diamond D encountered further delays and obstacles when its attorneys tried to secure information from the DOL regarding how the underpayment withholdings were calculated. *See* Item 67, ¶¶ 47–48, 78, 179, 187–89, 197–200, 216–20, 361–63, 369–71, 378–79, 394–400.

Finally, the DOL continued to put off resolution of the investigation when attor-

ney John Loughlin requested a mere three days for hearings in mid-July 2000. Yet, Loughlin, as well as Kinn, acknowledged that a meaningful and thorough challenge to the alleged underpayments would require weeks of hearings. Despite an awareness that the hearings could take weeks to complete, Loughlin scheduled dates for hearings in other cases after he issued the Notice of Hearing in May 2000. Tr. 545.

Therefore, Loughlin's testimony that he set aside just three days for hearings because his experience led him to believe that it would not take him more than two or three days to present his case was not just surprising but also unbelievable. Tr. 545. Further, Loughlin's statement that he had believed that Diamond D would need no more than a few days to present its case simply appears untrue in light of his prior conversations with Diamond D's attorney in which he learned that Diamond D seriously disputed the underpayment withholdings. Tr. 519–20. For the same reasons, the court does not credit Loughlin's testimony that, when he set aside just three days for a hearing, he was unaware that Diamond D would seek to challenge each and every alleged underpayment on a day-by-day, worker-by-worker basis. Tr. 574–76.

Diamond D's counsel, Brian Fitzgerald, testified that he notified Loughlin in late June 2000 of Diamond D's intent to contest each and every alleged underpayment. At the same time, Fitzgerald also advised Loughlin that it was imperative for Diamond D to achieve a speedy resolution regarding the withheld funds. Tr. 712–15. Even after learning of Diamond D's plans, though, Loughlin believed that the hearings could be concluded with an additional fourteen days of hearings. Tr. 515–521,

523. In addition, Loughlin continued to schedule hearing dates in other cases after having learned that the Diamond D file would require many more hearing dates than he initially expected. Tr. 544–45.

### III. The Withholdings

In his affidavit, Paul Clark states that the DOL's continued underpayment withholdings have prevented Diamond D from collecting sorely needed funds to which it would otherwise be entitled. Item 5, ¶ 4. This, in turn, has depleted Diamond D's cash reserves, which, in turn, has caused accounts payable to accrue "to dangerously high levels . . . ." *Id.* As a result of this mounting debt Diamond D has had to

> borrow[ ] over $1.5 million so that it can continue to conduct business. In addition . . . plaintiff states that as a result of the DOL's actions, it cannot secure future work because The Hartford will not extend surety credit to plaintiff until the Notices of Withholding are resolved.
>
> Furthermore, plaintiff has exhausted all of its available credit and, as a result, will soon become totally insolvent. Plaintiff seeks the release of the withheld funds so that it can pay its many creditors and salvage the corporation.

Item 34, p. 9 (citing principally from Item 5) (internal citations omitted). In a supplemental affidavit, Clark reiterated and clarified that the underpayment withholdings had placed Diamond D at the risk of total insolvency. *See* Item 24, ¶¶ 3–4, 6–7. At the preliminary injunction hearing, the plaintiff did not produce detailed evidence; instead relying on the Clark affidavits. No contradictory evidence was offered by the State defendants.

Kinn says that he prepared all of the DOL's "underpayment withholdings"[2] at

---

**2.** There are two types of withholdings involved in prevailing wage cases: "underpay-

ment withholdings" and "payroll withholdings." As their names suggest, underpayment

issue in this case in substantially the same manner. He testified that he estimated underpayments by compiling the information he obtained from agency records, reviewing Diamond D's payroll records, interviewing agency engineers and inspectors, and reviewing complaints and interviews with Diamond D employees. *See e.g.,* P–160, P–161, P–162, P–163.

On May 8, 1998, Kinn issued a payroll withholding notice against the Heim Street Project for $100,000 pursuant to Labor Law § 220(3–a)(c). P–20. Kinn states that he issued payroll withholdings because Diamond D had failed to produce payroll records, with an accompanying certification, and other supporting documentation for the Greiner Road, Heim Road and Main Street projects. Later, on May 21, 1998, Kinn issued a payroll withholding notice against the Main Street Project for $100,000 for similar reasons. P–22 & Tr. 25. Here, the court recognizes that these payroll withholdings were issued for DiPizio's failure to submit payroll records that complied with section 220–b's technical requirements. Nevertheless, it is also clear that Kinn secured copies of these same payroll records, which were the subject of these withholdings, by going through the sponsoring agencies (N.Y.S DOT and Erie County's DPW) on the projects under investigation. *See* Tr. 96.

On October 2, 1998, Kinn issued an underpayment withholding notice for $439,722.08 in monies due on the Heim Road project. P–50, P–52. As only $298,000 in funds remained due on Heim Road, the remaining $241,722.08 for Heim Road underpayments was cross-withheld from monies owed on the Main Street project. P–49.

On October 2, 1998, Kinn issued an underpayment cross-withholding notice of $593,131.31 based on the Greiner Road project. P–53, P–55. The withholdings for the Greiner Road underpayments were solely against the Main Street project because no funds remained due on the Greiner Road project.

In September and October 1999, Kinn revised the Greiner and Heim audits by preparing another complete set of worksheets. P–172, P–173; Tr. 299–300. At that time, Kinn incorporated additional information he had accumulated since the estimates in audit form were completed in October of 1998, including the 1996 Greiner payroll records. P–175 (Notes on Heim Road Inspector's Reports), P–178 (Heim classification notes), P–186 (notes on the Greiner Road project). Kinn's revised audits for Greiner and Heim called for a release of nearly $400,000 to Diamond D.

However, there was no release of funds to Diamond D because Kinn and the DOL went on to withhold additional funds based on alleged underpayments on the Main Street project. Tr. 40, 501. Kinn's Main Street audit indicated that Diamond D had underpaid its employees $718,739.01. P–193, P–194. Kinn delayed withholding the additional underpayments on the Main Street project until after he finished revising the Heim and Greiner estimates. Tr. 39–40, 231; P–158. Then, on October 1, 1999, Kinn issued a withholding notice of $718,739.01 for underpayment of wages on the Main Street project. P–193.[3]

After delivering the Greiner and Heim Road audits to Diamond D, Kinn referred the Heim Road, Greiner Road and Main

---

withholdings are based on allegedly underpaid wages and benefits, while payroll withholdings are based on failure to produce requested payroll records.

3. For a more detailed accounting of the DOL's withholdings, see this court's June 2000 order at Item 34, pp. 4–7.

Street projects to the Department of Labor Counsel's office for review and administrative hearing on October 26, 1999. Tr. 41; P–197, P–198, P–199.

Finally, the court takes note of Kinn's bold admission that he has had cause to withhold funds in every investigation he has ever conducted for the DOL Bureau of Public Works. Tr. 267. Contrary to the DOL's favorable interpretation of this fact, this admission tends to show a readiness on his part to conduct arbitrary and careless investigations.

## IV. Agency Records

In withholding just over $1 million from Diamond D in 1998 and then just over $1.2 million in 1999, Kinn relied heavily on information gleaned from agency records of the DOT. "Agency records" consisted primarily of the engineers'-in-charge daily journals and inspectors' daily reports. *See* State Defendants' Investigation Files of Plaintiff Diamond "D" Construction Corporation on the Heim Road, Greiner Road, and Main Street Public Works Projects ("Investigation Files"), Volumes A–E, N–Q, U–Y, FF–KK.

Kinn used these agency records in order to estimate the number of workers on a job site each day, the number of hours worked by each worker, and the classification of work performed by each worker. Kinn claims to have used these agency records, along with partial copies of Diamond D's payroll records and other inferences made during the investigation, in order to reconstruct events that took place on the project on a daily basis. Although this method of investigation has been expressly approved by some New York State courts, *see e.g., Georgakis Painters Corp. v. Hartnett,* 170 A.D.2d 726, 728, 565 N.Y.S.2d 863 (3d Dept.1991), those courts presumably approved of this auditing

method based on a record much different than the one before this court.

Kinn insists that his experience as a wage claims investigator has taught him that DOT agency records are one of the most reliable sources of auditing information because they are prepared by a disinterested party who has no interest or incentive to fabricate records. Tr. 435–436. In its post-hearing papers, the DOL further points out that the NYS DOT maintains strict guidelines as to how its engineers-in-charge and inspectors are to maintain records. That is, DOT records are to be kept on a daily basis, and track the progress of completed work on the project, including a list of manpower, equipment on the site and volume of materials used on the project. P–203, pp. 6, 14.

However, the testimony of Wendel and Savidge completely belies Kinn's claim that agency records are among the most reliable sources of information and seriously calls into question whether DOT engineers and inspectors even follow record-keeping regulations.

Wendel, who was the engineer in charge of the Main Street contract, testified at length. Wendel told Kinn that the agency records for Main Street were not reliable for purposes of determining the hours that employees worked or for the purpose of determining employees' work classifications or workforce numbers. Tr. 843–44, 848.

Wendel also said that the inspector's reports do not indicate the time that the work started on the project in the morning and finished in the afternoon and cannot be used to determine the specific hours that a contractor worked on a given day or used to determine the hours that individual employees worked. Tr. 839.

Wendel explained that inspectors' reports do not reflect the fact that workers

come and go during the day and that the same worker might perform several different types of work, some work off site and some on site. Therefore, if a report listed five pieces of equipment for a given day, that would not provide reliable proof that five equipment-operators worked that day. Tr. 841.

Steve Savidge, who was an inspector on the Main Street contract, had the opportunity to watch most of the work that was done there every day. Tr. 922, 925. Like Wendel, Savidge told Kinn that his inspector's reports were not reliable for the purposes of determining manpower, hours, or classifications. Savidge summarized his feedback to Kinn regarding the reliability of his agency records:

> I said they [the inspector's reports] were, that for a person to try to use them it would be impossible, because they were, they may not reflect who was actually on the job or when, and the men came on the job, and left on the job during that day at various points and time, they didn't—it might be, I mean, I might take the head counts in the morning, and then in the afternoon they are all gone. I might take it in the afternoon when nobody is there, or when everybody is there and then they are all gone, as far as I am concerned I really didn't intend for that to be used as far as who was there, and who was not there during the entire day. I would have to sit there and keep track of every man, all the men and equipment on a daily basis, the amounts of time that they are there would be impossible.

Tr. 943. Savidge rarely prepared his inspector's reports on the day that the work actually occurred. Tr. 929. As for classifications, Savidge usually just wrote down the same thing for every day, Tr. 931, and based his record of classifications on what tasks he generally saw a worker performing. Tr. 932.

Savidge advised Kinn that his reports were just a way for the State to keep track—in a rough way—of the men and equipment on a job. Savidge told Kinn that his reports were not meant to keep track of the exact amount of men who came on the job on a particular day. Tr. 935. "I could not be for certain how many men or equipment are on the job that day, based on the time that I did the IR's. I did the IR's days and weeks later, and I was not positive as to the men and equipment on the job that day." Tr. 936. Further, Savidge's daily listing of the equipment present on the job site does not correlate with the number of men on the job site. Tr. 936. That is, if Savidge listed five pieces of equipment for a particular day, that often meant that there were two operators present who ran those five machines at different times during the day.

Savidge also told Kinn that he had conducted wage interviews of employees, asked them questions regarding their wages, and no employees ever said they weren't properly paid. Tr. 940–41. Savidge said that he made wage interviews two or three times on the Main Street job. Tr. 941.

Wendel and Savidge's testimony is profoundly damaging to Kinn's admission that he relied heavily on agency records in completing his estimates and final audits and to Kinn's insistence that agency records contain some of the most reliable information available in wage claim investigations.

It is perhaps just as striking that Kinn even disregarded agency records on occasion and concluded that there were more operators on site than the engineer-incharge or inspector had indicated. For example, expert witness Paul Clark noted that Plaintiff's Exhibit 208–A reveals that

the certified payrolls for a certain day showed two operators; that the engineer's diary showed one operator; but that Kinn inexplicably claimed six operators for that day: Kearns, Lynn Gorski, DiPizio, Hopkins and unknown operators one and two. Tr. 777–78.

Kinn also relied on agency records created by Ignatowski, Dorobiala, and Stahley among others. DOL failed to call any of these men as witnesses. As a result, there is no testimony to support a finding that their reports and diaries were any more reliable than Wendel or Savidge's. When the court set these agency records next to one another—Wendel's diaries set next to Ignatowski and Dorobiala's, and Savidge's reports set next to Stahley's—it could detect no apparent differences in the information recorded or in the amount of care taken in preparing them. *Compare* Volume W (Wendel) *with* Volumes B (Dorobiala) and N (Ignatowski) of the State Defendants Investigation Files; *compare also* Volume II (Savidge) *with* Volume D (Stahley) of the State Defendants Investigation Files. Based on what the court heard from Wendel and Savidge, the court now draws a strong, adverse inference against the DOL regarding the reliability of Dorobiala and Ignatowski's diaries, as well as Stahley's inspector reports.

In addition to the testimony of Wendel and Savidge, the Bureau's Manual itself undermines Kinn's claim that he could reasonably rely on agency records. Indeed, the Manual enumerates nearly a dozen different techniques that investigators can use and sources on which they should rely, but the Manual neither encourages inspectors to consider agency records nor does it cite agency records as a preferred source of information.

Finally, on a related note, the DOL has argued that Kinn relied on agency records because public works employees rarely maintain logs that detail their hours or accurately describe, or classify, the work they perform on a daily basis. Tr. 436. In addition, the State insists that Diamond D's employees did not have access to the statutorily mandated prevailing wage schedule on site, their pay stubs did not detail their hours of work or hourly wages, and Diamond D refused to allow employees to be interviewed by contracting agencies or the DOL. *See* Item 66, ¶¶ 4, 8, 9.

The DOL's position on this issue is undermined by documents like Sal Masucci's log which is a chronicle of his daily hours from 1994 through 1998. *See* P–45; *see also infra* Facts Part V, A. Further, the record contains other documents, such as DOT wage interviews, which reveal that a number of Diamond D employees knew what the prevailing wage was and had no complaints about what Diamond D was paying them. *See infra* Discussion, Part V (discussing documents submitted by Kearns and Wisnowski).

## V. Kinn's Discussions with DOT and County Agents

Kinn met with Dorobiala on June 2, 1998, while investigating the Heim Road project. P–1/D–307 (Heim Road Case Contact Sheet 6–2–98 entry); Tr. 101, 290; P–25 and P–160. Dorobiala told Kinn about the one wage complaint he had of Patrick Rew from the Heim Road contract. Tr. 102 and P–25. However, when Kinn came to Dorobiala he knew only of complaints from Higgins and Kearns but never discussed Higgins or Kearns' complaints with Dorobiala. Tr. 115–119. He failed to discuss their wage complaints with Dorobiala despite the fact that the Bureau of Public Works Manual (P–202) directs wage investigators to initially assess the validity of wage complaints. Indeed, the Manual (P–202) requires that "upon receipt" of wage complaints, investigators like Kinn should

"visit the project site and ... investigate fully the claims and allegations concerning ... underpayment of the prevailing wage rate ... and interview employees to corroborate payroll records to ascertain whether or not prevailing wages are being paid." P–202, Item No. 4078, p. 7. Kinn's failure to comply with the Manual likely owes to the fact that, prior to this litigation, Kinn had never familiarized himself with the Manual and its provisions and had never received any formal training from the DOL as to his duties as an investigator. Tr. 225–26.

On June 22, 1998, Kinn met with Stahley, an Inspector on the Heim Road job. Tr. 113. Stahley told Kinn that Diamond D's whole crew normally worked ten-hour days. Yet, Stahley only generalized about the hours worked by Diamond D workers on Heim Road and did not specify who was in the work crew on any given day or during any particular week. Tr. 114. Kinn agreed that Stahley's statements regarding the Heim Road crew were vague with respect to the number of days worked and the type of work performed. Tr. 114. Moreover, Kinn admitted that some of Stahley's statements were not ones which a reasonable investigator would rely upon in performing a final audit. Tr. 114. Indeed, the fact that many employees worked many hours off-site, away from the project, is one of several reasons why Stahley's statements regarding ten-hour days were unreliable and incorrect. Nevertheless, Kinn did rely on Stahley's statements when he authorized the 1998 withholdings and did not revise his Heim Road withholding until October 1999.

On June 23, 1998, Kinn received the inspector's reports, engineer's diaries, and certified payrolls for Greiner Road from the County of Erie. The County couldn't find, and didn't produce at that time, the January 1996 to October 1996 certified payrolls. P–29 and Tr. 109. Kinn went on to calculate the 1998 withholdings on Greiner without the benefit of reviewing the missing 1996 payroll records. Kinn did not take the time to secure them through his subpoena power until June 1999. Tr. 110.

Then, on July 23, 1998, Kinn met with Ignatowski, the engineer-in-charge on the Greiner Road project for Erie County. P–32, Tr. 119, 120, 137. Ignatowski said that for a majority of the time, Diamond D worked more hours than he did. Tr. 120. However, Kinn admitted that this statement was ambiguous and that it left open the possibility that the Diamond D crew often did not work longer hours than Ignatowski. Tr. 120–21. Moreover, Ignatowski could not tell Kinn which days it had been that the crew worked more hours than he did, Tr. 121, nor could he tell Kinn who was in the crew except for a few days. Tr. 121–122. When Kinn questioned him about information on specific men and specific days, Ignatowski could not give it to him. Tr. 122–125.

Indeed, Kinn admitted that Ignatowski never told him who was in Diamond D's crew on any given day. Tr. 137. Kinn failed to discuss with any Diamond D employees, other than Kearns, whether they had ever worked ten hour days. Tr. 139–140. In light of Kinn's admissions and the evidence relating to agency records, there is little reason to believe that Ignatowski's reports were reliable.

## VI. Information Received from Diamond D Employees

The 1998 withholdings totaled just over $1 million. In authorizing these withholdings, Kinn assumed, in spite of contrary evidence, that Diamond D's crews for the Greiner and Heim Road project worked, on average, a ten hour work day during daylight savings time and eight hours dur-

ing non-daylight savings hours. Tr. 389–90; P–40, 43, 208(d).

Yet, it was not until October 9, 1998 and October 14, 1998 that Kinn mailed a set of inquiry letters to all Diamond D workers he was able to identify on the Heim and Greiner Road projects. Heim: P–59, 62, 66, 68, 70, 71, 74, 75, 76, 87, 88, 89, 97, 113; Greiner: P–65, 69, 72, 77, 78, 86. These letters would have only taken a matter of hours to prepare and should have been sent out when he first received wage complaints in June 1997. Tr. 190. Kinn knew it was vitally important to determine whether a given employee had a claim at an early stage in the investigation, nevertheless, in response to the Court's question as to why the inquiry was not made earlier, Kinn only said that he did not have the time to send out these letters. Tr. 193–95.

Kinn also claims that he did not have time to conduct the extensive employee interview process prior to the 1998 withholdings because of the payment status of the Greiner and Heim Road projects. Tr. 195. That is, the sponsoring agencies had almost completely paid out the balances owed on those projects, and the DOL feared that there would be nothing to withhold if it did not act quickly.

In any event, Kinn had no recollection of his interviews with specific Diamond D employees. Moreover, Kinn's notes regarding those interviews were unintelligible, even to Kinn himself. Tr. 263–64; see P–122, P–174, P–176. On this point, despite the fact that the Bureau's Manual directs investigators to take detailed notes of their conversations with employees on public contracts, Kinn testified that DOL supervisors instructed him not to take detailed notes or written statements from employees when conducting the interviews in a wage claim investigation. Tr. 264–65. Kinn said that he used to take careful notes when he first started, but that he

was discouraged from doing so by his supervisors in the Public Works Bureau. Viewed in conjunction with the rest of the record, this kind of detail further demonstrates that the DOL regularly authorizes substantial withholdings on the basis of careless and inscrutable wage claim investigations.

### A. Sal Masucci

On September 27, 1998, Kinn interviewed Sal Masucci in connection with both Heim and Greiner Road. P–44 and Tr. 148. Masucci gave Kinn his diary (P–45), which listed hours for each day worked. Despite the fact that on many days Masucci listed less than ten hours days, Kinn submitted his initial estimates on Heim and Greiner and determined that Masucci always worked ten-hour days. P–45. Moreover, Kinn assumed that Masucci's co-workers worked ten hour days on the basis of the hours Masucci allegedly worked. See P–208 and Tr. 380–81, 386. Based on the foregoing discussion of Masucci's personal diary and Kinn's failure to confer with each employee on Heim Road, it is evident that Kinn's consistent assumption of uniform ten-hour days was not supported at all by the record.

Further, although Kinn assumed that Masucci worked a ten hour day, Kinn never bothered to ask Masucci how many hours a day he had worked and did not even attempt to interview him to determine what he was actually paid; nor did Kinn ask to see sources like W–2s and pay stubs. Tr. 141. From the information received, Kinn knew that Masucci likely had no claim at that time but nevertheless went on to estimate a substantial claim for Masucci's work on Greiner Road anyway. Tr. 141–42.

### B. Thomas Kearns

On April 17, 1998, Thomas Kearns filed a claim of unpaid wages on the Greiner

Road contract. This was the first and only complaint by anyone on Greiner Road. Tr. 79; P–13. Kearns' complaint is imprecise- not specifying any amount of underpayment for any particular week. Kearns did attach pay stubs for many weeks in 1995 and 1996, and for a few weeks in 1997. Tr. 81 and P–13. Yet, in making estimates as to Kearns' unpaid wages, Kinn ignored this documentary information setting forth what Kearns was actually paid. P–52, P–55, P–190, P–192, P–194 (estimates on Heim, Greiner and Main). When questioned about a pay stub, week ending August 24, 1996, that showed Kearns had been paid $1333.37. Kinn admitted that Kearns did not claim that he was underpaid for that week or any other week. Tr. 81. Also, he failed to ask Kearns for his W–2s reflecting his gross pay from Diamond D in 1997. Tr. 83.

Kinn transmitted his initial estimate on Greiner to Albany on August 27, 1998. Tr. 128; P–1, P–36. Yet, Kinn did not interview Thomas Kearns, the only complainant on Greiner Road, about his complaint until August 24, 1998. P–35. Thus, Kinn failed to assess the validity of the Kearns complaint, and instead chose to do an estimate on Greiner, which ultimately resulted in the withholding on Greiner Road of $593,131.31 (P–53) against monies due Diamond D on the Main Street contract.

## C. Thomas Wisnowski

On April 20, 1998, when Kinn spoke with Thomas Wisnowski at the Main Street job site, Wisnowski told him that he was being paid around $26.00 per hour. Tr. 73. As to Wisnowski, Kinn admitted that he did not determine, at that moment, whether this was the correct prevailing wage rate, even though he could have done so without great difficulty. Tr. 73–74. He acknowledged that the prevailing rate schedules

were maintained in Wendel's field office at the Main Street job site. Tr. 75.

When Wisnowski responded to Kinn's letter (P–62), he told Kinn that he averaged $1100.00 per week. Yet, in his initial estimates on Heim and Greiner relative to Wisnowski, he had assessed Wisnowski claims totaling $27,000.00. P–52, P–55. When Kinn later revised Heim and Greiner in 1999, and did the estimate on Main Street, he assessed Wisnowski over $200,000.00 in claims. Given what Kinn knew about Wisnowski's substantial weekly earnings, Kinn could not offer a credible explanation as to why he made such excessive assessments as to Wisnowski. Furthermore, Kinn apparently never asked any of these employees whether they worked off-site hours.

In addition, Paul Clark observed that Kinn assumed Wisnowski had worked ten hours on-site across the board, instead of ascertaining whether he had been off-site on a particular day. Tr. 782–783. Indeed, for the week ending April 22, 1995, Kinn credited Wisnowski as only being paid $257.72. Tr. 783. However, Wisnowski had expressly told Kinn he earned much more than that per week.

## D. "Unknown" Workers

The estimates on which the October 1998 withholdings were based included monies for supervisory and salaried personnel. Supervisory and salaried personnel are required to receive the prevailing rate of wages if they perform the work of a laborer, workman or mechanic. *See* State Defendants' Proposed Conclusions of Law ¶ 90. Kinn's investigation revealed that Diamond D's supervisory personnel, specifically Mr. DiPizio and Mr. Hopkins, were performing non-supervisory, construction work that was subject to being paid prevailing wage rates for the class of work they were performing. Tr. 331–33;

P–1/D–307 (Heim Case Contact Sheet 6–22–98 entry).

Kinn knew all along that "unknown 1" and "unknown 2," who were referred to in the initial estimates on Heim and Greiner, were actually Joseph DiPizio[4] and Leo Hopkins. Tr. 270. Kinn's computer printout summary of his estimate on Heim Road (P–52) assessed totals for unknown workers of $211,000, which included 16 percent interest. Tr. 160–161. Kinn admitted that he did not define the basis for his assertion of claims as to unknowns in either the four inch thick computer printout detailing his estimates, or in the shorter summaries. P–52 and P–55.

The assessment as to Hopkins, initially on both Heim and Greiner, and in the revised Heim, Greiner and Main Street estimates, totaled $455,000 but Kinn admitted that he never interviewed Leo Hopkins. Tr. 272. Based upon information later provided to him about Leo Hopkins, he testified that he would now adjust this claim by ⅔ downward, but, as of this order. and opinion's issuance, he has not done so. Tr. 277–78. Not only did he not attempt to interview Hopkins but during his investigation he never attempted to verify what Hopkins was actually paid by obtaining W–2s, pay stubs; by subpoenaing Diamond D payroll ledgers; by obtaining State payroll tax quarterly reports; or by using any other method of investigation.

With respect to Leo Hopkins and Joseph DiPizio, although Kinn acknowledged that they were supervisory personnel, he never credited them with hours for such work and estimated them to be full-time workers and operators of equipment. Tr. 404. Such assumptions were made without a rational basis. Kinn also credited DiPizio with only being paid $10.00 per hour. Tr. 404.

At the hearings, Kinn claimed that Fitzgerald could have asked him to identify the unknowns, Tr. 281, yet Diamond D was informed at the time that it could not dispute the unknowns or any other aspects of the estimates until a hearing was held. P–142.

Finally, Wendel testified that Diamond D had, in fact, identified all of its Main Street employees on the relevant certified payrolls. Tr. 846. Wendel's statement on this issue significantly undermines Kinn's proffered justification for assuming that there were a number of unknown workers on the Main Street project.

## VII. On–Site versus Off–Site Work

"On-site" work refers to the work that employees perform at the actual job site (*e.g.*, Heim Road or Main Street), while "off-site" work refers to the work that those same employees perform somewhere other than the actual job site itself. For example, applying a layer of asphalt to a road under construction would probably be considered "on-site" work, while building a steel guard rail in a metal shop would be considered "off-site" work.

Kinn freely admitted that he was aware of the on-site/off-site distinction and also admitted that he was aware that Diamond D employees probably worked a significant number of hours off-site. Despite this, Kinn inexplicably assumed in his calculation that Diamond D employees only worked on-site. As a result of this baseless assumption, Kinn recklessly presumed

---

4. In the 1999 withholdings, Kinn released all funds attributed for Mr. DiPizio in the estimates on Heim and Greiner Roads and did not withhold funds for underpayments attributable to Mr. DiPizio on the Main Street project because of conflicting opinions he received from the Department Counsel's office regarding payment of the prevailing wage rate to owners who worked on a public work site. Tr. 327–329.

that when the certified payrolls showed an employee having worked less than eight on-site hours that: (i) the employee did not work off-site at any other time for that day, (ii) the employee worked only on-site for a full eight or ten hours, (iii) Diamond D had not reported that employee as on-site for all of the hours worked, and (iv) Diamond D had not paid that employee for the unreported on-site hours. Tr. 89–90 and P–165, P–172, P–173.

## VIII. Exorbitant Interest and Civil Penalties

While the Labor Law provides that the DOL should withhold sixteen percent of the underpayments for each year of the underpayments, it was troubling to learn of how Kinn applied interest prospectively and for total periods of up to three and four years. By withholding interest for such lengthy periods of time, the DOL capitalized on its own delays, *see supra*, and revealed its intent to put off hearings for years after the investigations were initiated and after money had been withheld.

For example, Kinn's 1998 estimate on Heim Road was for unpaid wages and fringes of $291,741.00. P–49. The interest on that alleged underpayment totaled $140,000.00, which represented sixteen percent interest applied for three years. Tr. 155–56. Yet, Kinn set the starting date for the 1998 Heim Road investigation as February 1996 and filed the initial withholdings in October 1998–yielding a period of two and one-half years. Thus, the 1998 Heim Road interest calculations include nine months when the Bureau did nothing with Diamond D file (from June 1997 until March 1998) and included four months of prospective interest. Moreover, Kinn ad-

mitted that he failed to calculate the interest from the date of *each* alleged underpayment, as the Labor Law requires. Tr. 155–56. Kinn's knowingly inaccurate assessment of interest, then, resulted in an over-assessment of approximately two years; an inflated withholding of approximately $97,000. *Id.*[5]

Kinn employed similar tactics ·when applying interest to the 1998 withholdings on Greiner Road. *See* Tr. 171–72 and P–53. On Greiner Road, though, Kinn assessed four years of interest, not just three, because work on Greiner Road commenced about a year before the work on Heim Road.

The DOL's unexplained delays in assigning the file to Kinn also added significant interest to the overall withholdings. Furthermore, the delays that Diamond D endured before the investigation reached the hearing stage created yet more interest, and more funds withheld from Diamond D.

Further, Kinn claims he assessed interest for such an extensive period of time because he was projecting that a hearing would take place in a year or two. Tr. 157.

In addition· to these exorbitant interest withholdings, Kinn applied a civil penalty of 25 percent. Kinn stated that he applies such a penalty in every investigation he conducts. Tr. 315. Kinn offered no reason for imposing a penalty of 25 percent, other than that he is instructed to do so. Tr. 315. While Labor Law § 220–b certainly permits the DOL to impose a penalty of *up to* 25 percent on public works contractors, that provision also indicates that a contractor's willfulness is a key consideration and that several factors should also be weighed.[6] Yet, Kinn admits

---

5. The Manual further provides that interest will be applied up until "restitution of the underpayment" by the contractor. P–202, Item No. 4080, p. 2.

6. The Labor Law specifically provides:
 [T]he order of the fiscal officer [,typically the DOL Commissioner,] may direct payment of a further sum as a civil penalty in

that, per his normal practice, he applied the maximum penalty on a pre-hearing basis.[7]

## IX. The Bond Issue

Diamond D has continually requested an opportunity to post a bond for the underpayment withholdings, and the DOL has continued to refuse this request.[8]

The Department of Labor, principally by its attorney John Loughlin, has maintained that it has a policy of not accepting bonds to release withholdings for underpayments. Tr. 513–14. Mr. Ben–Amotz argued that this policy is warranted by the fact that bonds do not protect workers' underpaid or unpaid wages as securely as withholdings can. Tr. 146.

However, Edward McMahon testified that he obtained labor and material pay-

ment bonds[9] for the three contracts principally at issue in this case: Greiner, Heim, and Main. McMahon insists that the labor and material bonds for those projects would cover the DOL's wage claims. Tr. 968.[10] That is, the DOL could bring an action against these bonds in the event there is a determination that there are unpaid prevailing wages. Tr. 971.

McMahon's testimony is unrebutted. Thus, the court accepts as true that the labor and material bonds currently in place would cover any underpayments that the DOL might ultimately find. Based on the present record, then, the DOL's "policy" comes off as unduly harsh; a tactic designed to give the DOL an unjust advantage in negotiating favorable settlements with public works contractors.

---

an amount not exceeding twenty-five percent of the total amount found to be due. In assessing the amount of the penalty, due consideration shall be given to the size of the employer's business, the good faith of the employer, the gravity of the violation, the history of previous violations of the employer or any successor or substantially-owned affiliated entity or any of the partners if the contractor or subcontractor is a partnership or any of the five largest shareholders of the contractor or subcontractor, as determined by the fiscal officer, and any officer of the contractor or subcontractor who knowingly participated in the violation of this article, and the failure to comply with recordkeeping or other non-wage requirements. Upon the fiscal officer's determination of the penalty, where the fiscal officer is the commissioner, the penalty shall be paid to the commissioner for deposit in the state treasury. Where the fiscal officer is a city comptroller or other analogous officer, the penalty shall be paid to said officer for deposit in the city treasury. NYS Labor Law § 220–b(d).

7. The Bureau's Manual offers no further guidance on what investigators should consider when assessing penalties.

8. The Fourth Department of New York State's Appellate Division found that Diamond D was not entitled to post a bond for the so-called "payroll withholdings." *In re Diamond D Const. Corp.*, 261 A.D.2d 903, 689 N.Y.S.2d 844 (4th Dep't 1999); *In re Diamond D Const. Corp.*, 261 A.D.2d 905, 689 N.Y.S.2d 913 (4th Dep't 1999). However, the Appellate Division's ruling did not address the issue of whether contractors should be able to bond off alleged underpayment withholdings.

9. Performance bonds guarantee that the contractor will complete the job for the price bid, while payment bonds guarantee payment of employees, suppliers, subcontractors, etc. Tr. 965. Performance bonds are also known as labor and material payment bonds.

10. The labor and material payment bonds are in the DOL documents submitted to Federal Court, Vol. F, p. 59. ¶ 537. The Heim Road labor and material payment bond remains in place in the sum of $2,624,359.00. (HT Vol. V, p. 970). ¶ 538. The Main Street labor and material bond is the same as the Heim Road bond. ¶ 539. The labor and material bond for the County of Erie on Greiner Road, is different. ¶ 540.

## DISCUSSION

### I. Standard for Granting Preliminary Injunction

■ In order to prevail on a motion for a preliminary injunction, Diamond D must show that it will suffer irreparable harm in the absence of an injunction and must also demonstrate a clear or substantial likelihood of success on the merits. Item 34, pp. 9–10 (citing cases).

■ In its order of June 2000, the court recognized that the "destruction of a business ... [is a] type of irreparable injury for which there is no adequate monetary remedy." Item 34, p. 29. However, the court did not reach a conclusion on this issue because it ruled at that time that the Eleventh Amendment barred Diamond D's claims.

Diamond D's proof on imminent and irreparable harm is unrebutted. The foregoing preliminary findings of fact indicate that the DOL's continued withholdings imminently threaten Diamond D's viability. Diamond D's substantial proof regarding an imminent threat to corporate viability is sufficient to establish the threat of imminent and irreparable harm.

In light of the foregoing, the only remaining issue is whether Diamond D has established a clear or substantial likelihood of success on the merits of its claim.

### II. *Younger* Abstention Doctrine

■ In *Younger v. Harris*, 401 U.S. 37, 44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts must refrain from interfering with ongoing State criminal proceedings. Over the last twenty years, the Supreme Court has expanded *Younger*'s scope to include State civil and administrative proceedings. Indeed, the *Younger* abstention doctrine has been

> extended to civil proceedings in which important state interests are involved. Most recently, the *Younger* doctrine has been extended to pending state administrative proceedings as long as there is the potential for state court review of the federal litigant's constitutional claims.

*Christ the King Reg'l High School v. Culvert*, 815 F.2d 219, 224 n. 5 (2d Cir.1987) (citation omitted). Three factors must be present in order for a court to apply the *Younger* doctrine.[11] In the order of June 2000, this court has recognized that the State defendants have satisfied each of *Younger*'s three elements. Item 34, p. 13.

In *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir.1994), the court of appeals held that, despite *Younger*:

> federal courts should still interven[e] ... upon a showing of "bad faith, harassment or any other exceptional circumstance that would call for equitable relief." Generally, for ... a showing [of bad faith] to be made, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome. But, a refusal to abstain is also justified where a prosecution or proceeding has been brought ... in bad faith or for the purpose to harass.

*Id.* at 103–04 (citation omitted). Diamond D urges two different exceptions to *Younger* abstention. Specifically, Diamond D argues that the present record supports a finding of the "bad faith" exception and, in

---

11. First, there must be an ongoing state proceeding. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 626–27, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). Second, an important state interest must be implicated in that proceeding. *Id.* Third, the federal plaintiff must have an adequate opportunity for judicial review of constitutional claims during or after the proceeding. *Id.*

the alternative, that the record supports a finding of the "extraordinary circumstances" exception.

■ The court agrees on both counts. For reasons discussed in much more detail *infra,* the court first finds that the DOL has unnecessarily delayed the progress of the investigation and hearings and has withheld funds on the basis of an arbitrary investigation. In this way, the DOL has evidenced an intent to harass and coerce Diamond D into paying the underpayment withholdings, regardless of whether the withholdings have any basis in fact. Diamond D has also made a case for federal intervention under the so-called "extraordinary circumstances" exception to *Younger.*

Briefly, an analysis of the extraordinary circumstances exception starts with the Supreme Court's decision in *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975).

■ The Court's decision in *Kugler* has become the leading word on what constitutes "extraordinary circumstances" in a *Younger* analysis. Indeed:

The most extensive explanation of those "extraordinary circumstances" that might constitute great, immediate, and irreparable harm is that in *Kugler v. Helfant,* 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). Although its discussion is with reference to state criminal proceedings, it is fully applicable in [a civil] context as well.

. . . .

The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. But whatever else is required, such

circumstances must be "extraordinary" *in the sense of creating an extraordinarily pressing need for immediate federal equitable relief,* not merely in the sense of presenting a highly unusual factual situation.

*Id.* at 124–125, 95 S.Ct. 1524.

*Moore v. Sims,* 442 U.S. 415, 433–34, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *see also Trainor v. Hernandez,* 431 U.S. at 442 n. 7, 97 S.Ct. 1911 (holding that federal courts should abstain from hearing plaintiff's federal claim unless remedy in state proceeding is inadequate to litigate the constitutional claims).

The process of determining whether "extraordinary circumstances" exist is not an easy one. The inquiry in each successive case tends to be so fact specific that precedent is not of great assistance. In *Kugler,* the Supreme Court acknowledged as much:

The scope of the exception to the general rule of equitable restraint for "other extraordinary circumstances" has been left largely undefined by this Court. In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, however, the Court gave one example of the type of circumstances that could justify federal intervention even in the absence of either harassment or bad-faith enforcement of a state criminal statute, by quoting from *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416: "It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." 401 U.S., at 53–54, 91 S.Ct. 746.

The Court then stated: "Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify

what they might be." *Younger*, 401 U.S. at 54, 91 S.Ct. 746.

*Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488, supplied another example of such "extraordinary circumstances." In that case the Court found it unnecessary to decide whether the rule of *Younger v. Harris*, applies with the same force when state civil, rather than criminal, proceedings are pending because "the predicate for a *Younger v. Harris*, dismissal was lacking . . . . (T)he appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board." 411 U.S. at 577, 93 S.Ct. 1689.

*Kugler*, 421 U.S. at 125 n. 4, 95 S.Ct. 1524. In this case, there is no "flagrantly" unconstitutional statute, as alluded to in *Watson v. Buck*, and there is no credible allegation that the DOL is "incompetent by reason of bias to adjudicate" the withholdings issue, as was the case in *Gibson.*

However, the Court in *Kugler* also made clear that this exception defies definition and that there would be many unforeseen scenarios that might create "extraordinary circumstances." In this case, the issue is whether extraordinary circumstances can be seen in the fact that Diamond D's viability as a business is being imminently threatened by the DOL's arbitrary withholdings and by the undue delays that have been associated with the investigation and hearing process.

■ First, it must be remembered that *Younger* abstention "naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issue involved." *Trainor v. Hernandez*, 431 U.S. at 441, 97 S.Ct. 1911.

Here, Diamond D has not and likely will not be provided with an opportunity "to raise and have *timely* decided . . . the federal issue[s] involved." This concept of "timeliness," and how it relates to substantive and procedural due process, factors prominently into the present analysis.

Similarly, the Supreme Court has repeatedly held that due process in general must afford a party "the opportunity to be heard . . . 'at a *meaningful time* and in a meaningful manner.'" *Barry v. Barchi*, 443 U.S. 55, 66, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979). Thus, the issue of timeliness is central both to a *Younger* inquiry into extraordinary circumstances *and* to an inquiry into fundamental aspects of due process.

■ Moreover, a substantial delay in having constitutional claims resolved may give rise to "extraordinary circumstances."

The Court in *Younger v. Harris*, reproduced the language in *Dombrowski v. Pfister*, that suggests that *delay in obtaining appellate disposition may be a sufficient "extraordinary circumstance" justifying federal intervention to prevent irreparable harm:*

> But the allegations in this complaint depict a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss of or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination. These allegations, if true, clearly show irreparable injury.

*Younger*, 401 U.S. at 48–49, 91 S.Ct. 746, quoting from *Dombrowski*, 380 U.S. at 485–486, 85 S.Ct. 1116 . . . .

*Duke v. State of Texas*, 477 F.2d 244, 254 n. 6 (5th Cir.1973) (concurring Goldberg,

J.) (emphasis added). Although the present case does not involve "a substantial loss of ... freedom[ ] of expression," as alluded to in *Duke*, this case *does* present a situation in which delayed access to judicial review will likely cause great and immediate harm to Diamond D.

In addition, *Martin–Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 564 (6th Cir. 1982), is of some assistance to the court's analysis. *Martin–Marietta* is admittedly distinct from this case in that it involved a situation where the State court was applying a statute which may have been "flagrantly and patently violative of express constitutional prohibitions." 690 F.2d at 564. However, *Martin–Marietta* resembles this case in that time was of the essence there so that a battle of tender offers could be resolved before the federal issues became moot. That is, any delay in judicial resolution would have not only given the one company a great advantage over the other but also would have resulted in a permanent loss of the federal right being asserted. The Sixth Circuit concluded that the extraordinary circumstances exception was available for the following reasons:

> [Given] Bendix and Martin–Marietta['s] race to control each other's board of directors... and [g]iven ... that time is of the essence, and that the only state court decision to date has found the antifraud provisions of both statutes to be constitutionally applied to interstate tender offers necessitating further appeals or pursuit of a writ of superintending control, we conclude that Martin–Marietta and United Technologies do not have an adequate opportunity to raise and have timely decided the federal issue involved.

*Martin–Marietta*, 690 F.2d at 564. Similarly, from this record it appears most likely that Diamond D will not be able to have its constitutional challenges adjudicated in a State forum without first facing an imminent risk of total financial ruin-making any relief Diamond D might secure there meaningless.

■ The extraordinary circumstances exception also requires a finding that a party will suffer "great and immediate harm" in the absence of a federal court's intervention. *Kugler*, 421 U.S. at 124–25, 95 S.Ct. 1524. Courts have held that the destruction of a business qualifies as a great and immediate harm.

> *Surely the damage from this sort of activity is both irreparable and "great and immediate." It can put the plaintiffs out of business without ever convicting any of them of anything.* Nor can the threat to plaintiffs' first amendment rights be eliminated by defense against the state prosecutions. Successful defense against eleven of them, plus the voluntary dismissal of two others, brought the filing of fourteen more, and later of an additional nineteen.

*Grandco Corp. v. Rochford*, 536 F.2d 197, 203 (7th Cir.1976) (quoting *Krahm v. Graham*, 461 F.2d 703, 707 (1972)); *see also Cinema Classics, Ltd. v. Busch*, 339 F.Supp. 43, 47 (C.D.Cal.1972) (acknowledging that being put out of business amounts to great and immediate harm).

■ As noted *supra*, this court has, in a related context, "recognize[d] that [t]he destruction of a business has long been held to constitute the type of irreparable injury for which these is no adequate monetary remedy." Item 34, p. 29. Although the foregoing standard governs the issuance of preliminary injunctions, it is still relevant to a *Younger* inquiry into great and immediate harm. "The great and immediate harm requirement is not a separate standard for the issuance of a preliminary injunction. It merely describes the type of irreparable injury which must be

shown to satisfy the traditional preliminary injunction standard." *Record Head Inc. v. Olson,* 476 F.Supp. 366, 371–72 (D.N.D.1979). In this case, the delays and the withholdings associated with the DOL's investigation represent a great and immediate threat of irreparable harm to Diamond D.

Indeed, the DOL has unduly delayed the progress of its investigation. The first wage claim complaints were received in June 1997. However, the file was not assigned to Kinn until February 1998. Kinn did not act on this assignment until a month later. Kinn issued the first withholdings of just over $1 million in October 1998. In October 1999, Kinn modified the DOL's withholdings by revising the Greiner and Heim withholdings downward by approximately $400,000 and then withholding over $700,000 on the Main Street project. As of October 1999, the DOL was withholding just over $1.2 million.

Thus, Diamond D has suffered a deprivation of a constitutional property interest since October 1998. *See* Item 34, p. 30. Kinn referred the file to Albany for a hearing in November 1999. However, the DOL did not issue a notice for post-deprivation hearings until May 18, 2000. Not only has the DOL offered no explanation for this six-month delay, but the DOL had not even issued its notice of hearing until after Diamond D had commenced this federal lawsuit in April 2000.

The DOL hearings were then scheduled for mid-July 2000, which was 21 months-almost two years-after Diamond D had been deprived of a constitutional property interest. Making matters worse, Loughlin claimed he was unable to accommodate Diamond D's request for consecutive hearing dates so that the matter could be resolved without delay, even though he was aware that Diamond D intended to dispute the DOL's claims thoroughly and

that the hearings would cover many days. Yet, Loughlin also admitted that he continued to schedule hearing dates for other cases after he had learned that Diamond D sought consecutive hearing dates. These hearings are still ongoing. The DOL and Diamond D agree that a thorough challenge to the withholdings will take weeks of further hearings. Even at this late date, the DOL cannot offer Diamond D consecutive and uninterrupted hearings.

Given all of this, the DOL's post-deprivation hearings will not be completed until late in 2001. Thus, Diamond D's post-deprivation hearings will likely not conclude until well over two years after the DOL first withheld more than $1 million of moneys otherwise due Diamond D.

Any appeal of the DOL Commissioner's final decision would take the form of an Article 78 proceeding and would presumably involve Diamond D's constitutional challenge to the Labor Law § 220–b and its claims of substantive due process violations. Thus, Diamond D will most likely be forced to wait three years or more before having its federal constitutional claims heard by a State court.

If due process mandates an opportunity to be heard at a "meaningful time" and if *Younger* abstention "presupposes the opportunity to ... have [federal constitutional claims] *timely* decided," then an essential predicate of *Younger* abstention is lacking, since Diamond D is not being afforded meaningful due process by the available State forums. Furthermore, cases like *Kugler, Duke,* and *Martin–Marietta* lead this court to conclude that the facts of this case constitute the kind of extraordinary circumstances that warrant an exception to *Younger* abstention. Under either exception-the bad faith exception or the extraordinary circumstances exception-*Younger* abstention is not warranted and an inquiry into the merits of

Diamond D's constitutional claims is, as a result, appropriate.

### III. Diamond D's Constitutional Claims

#### A. Section 220–b Unconstitutionally Vague "As Applied"

 In its post-hearing papers, *see* Item 68, pp. 41–51, Diamond D argues that Labor Law § 220–b (" § 220–b") is unconstitutionally vague as applied.[12] A challenge for vagueness as-applied requires a two part analysis: "A court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir.1999) (quoting *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir.1993)).

There is no dispute as to the first prong; it being clear that § 220–b gives contractors adequate notice of what conduct is prohibited. That is, contractors can read § 220–b and understand that they must pay the prevailing rate of wages for on-site work done on public works contracts.

It is the second prong of the test-the "explicit standards" prong-that presents the closer question. The Supreme Court has come to recognize this second prong as the more important of the two. *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Supreme Court explained the second prong of the test for vague-as-applied in the following way:

> [I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id.* at 107, 92 S.Ct. 2294. Since *Grayned*, though, courts have looked with leniency on vague standards in statutes, such as Labor Law § 220–b, which regulate commercial activity. In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), the Court explained:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe..

*Id.* at 498–99, 102 S.Ct. 1186. It must also be acknowledged that "effective law enforcement often 'requires the exercise of some degree of ... [prosecutorial] judgment' [and that] this alone does not render a statute unconstitutional." *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir.1992), *abrogated on other grounds by*

---

12. Diamond D cannot succeed in showing that § 220–b is unconstitutionally vague on its face. *See* Item 68, pp. 45–47. A constitutional challenge based on vagueness "that does not involve First Amendment freedoms is to be evaluated on an 'as applied' basis." *Association of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 613–14 (2d Cir.1996) (quotation and citation omitted).

*Posters 'N' Things, Ltd. v. United States,* 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) (quoting *Grayned,* 408 U.S. at 114, 92 S.Ct. 2294).

■ Nevertheless, a statute may still prove unconstitutionally vague as applied where State officers are given "unfettered discretion" in interpreting a law and where, as a consequence, the treatment of similarly situated persons "varie[s] greatly." *Chatin,* 186 F.3d at 89 (quoting *Chatin v. State of New York,* 1998 WL 196195, at *6 (S.D.N.Y. Apr.23, 1998)). In other words, a statute may prove unconstitutionally vague as applied where its "commands . . . are so vague and indefinite as really to be no rule or standard at all." *Association of Int'l Auto. Mfrs., Inc. v. Abrams,* 84 F.3d 602, 613–14 (2d Cir.1996) (quotation and citation omitted).

■ Diamond D argues that the State legislature failed to give wage claim investigators sufficient guidance and standards when it codified the following language in § 220–b:

> If, on the fiscal officer's own initiative, unpaid wages or supplements *appear to be due,* the fiscal officer shall immediately so notify the financial officer of the civil division interested, . . . who shall withhold from any payment due or earned the contractor or subcontractor executing any public improvements, sufficient moneys to satisfy said wages and supplements, including interest at the rate provided herein, and any civil penalty that may be assessed as provided herein, pending a final determination.

New York State Labor Law § 220–b(2)(a)(1). Specifically, Diamond D insists that the phrase "appear[s] to be due" does not provide wage investigators with rules or standards to employ or meaningful guidance to follow.

During the hearings, neither Kinn nor witness John Loughlin, who acts as the DOL's counsel in the related State administrative hearings, could cite to any objective bases for determining whether unpaid wages "appear to be due" under the statute.[13] Kinn admitted that the statute did not define or elaborate on this phrase, Tr. 224, and Loughlin stated that the standards to apply in determining whether wages "appear to be due" are based on the "morals or ethics of the investigator." Tr. 542–43. Further, the DOL Public Works Bureau's Manual does not define the phrase "appears to be due."

Kinn repeatedly stated during the first day of hearings that it was clear to him from the start that this was going to be an investigation of "great magnitude." Statements to this effect proved not just conclusory, but also unsubstantiated by the record. Indeed, Kinn's investigation was fundamentally flawed, very often not grounded in fact, and conducted in an arbitrary fashion. Kinn's superiors were certainly aware of these problems with Kinn's investigation, but failed to correct them. The court's findings of fact on this issue are discussed in great detail in the Facts Section of this order and opinion. *See supra.* For the purposes of analysis, the court will now review those findings in summary form.

**13.** Certain courts have read § 220–b(2)(a)(1) as requiring that the DOL investigator evaluate a contractor's wage payments and make an objective and rational determination that the contractor appears to be in violation of Labor Law § 220(3). *See John Schepanski Roofing & Gutters v. Roberts,* 133 A.D.2d 757, 520 N.Y.S.2d 46, 47 (2d Dept 1987); *Bay-* *wood Elec. Corp. v. N.Y. State Dep't of Labor,* 232 A.D.2d 553, 649 N.Y.S.2d 28, 30 (2d Dept 1996). Nevertheless, the present record demonstrates that the statute requires very little from DOL investigators and leaves them free to conduct investigations in any way they see fit.

! In his investigation, Kinn relied on reports from engineers and inspectors even though he knew that these reports were not reliable for his purpose. Wendel and Savidge told him as much. *See supra* Preliminary Findings of Fact Part IV.

! He concluded that the number of on-site operators was the same as the number of pieces of equipment on-site, even though officials from the sponsoring agencies explained to him why such an inference would be flawed. *See supra* Preliminary Findings of Fact Part IV.

! He failed to interview all but a few Diamond D employees. When he did interview employees, he failed to take detailed notes and ignored employee records such as pay stubs. *See supra* Preliminary Findings of Fact Part VI.

! He knew that many Diamond D employees would have worked off-site, yet he refused to consider this fact and assumed that they worked on-site at all times. *See supra* Preliminary Findings of Fact Parts IV and VII.

! He assumed that employees worked ten-hour days without having a rational basis for that conclusion. *See supra* Preliminary Findings of Fact Parts V and VI.

! He continued to list unknown employees when the records he had revealed that the so-called unknowns were Gorski and Hopkins. *See supra* Preliminary Findings of Fact Part VI, D.

! He had the power to subpoena records when he needed more information, but only used this power once. *See supra* Preliminary Findings of Fact Part V.

! He revealed a readiness to conduct an arbitrary and careless investigation when he boldly admitted that he has withheld funds in every investigation he has ever conducted for the DOL' Bureau of Public Works. *See supra* Preliminary Findings of Fact Part III.

! In the end, he authorized underpayment withholdings on the basis of an investigation that was essentially worthless.

! Kinn never consulted the Bureau's Manual. In fact, much of what he did was contrary to the Manual's instructions. *See supra* Preliminary Findings of Fact, Part I.

! As for the DOL as a State agency, it sent Kinn out into the field without ever giving him any formal training for the job of wage claims investigator. *See supra* Factual Background.

! The DOL also failed to provide meaningful supervision of Kinn's work. In fact, it appears that Kinn's supervisors gave him advice that was contrary to the Manual and good common sense. *See supra* Preliminary Findings of Fact, Part VI.

While the foregoing reveals that Kinn's investigation and audit of Diamond D were arbitrary, section 220–b(2)(a)(1) does not require investigators to conduct investigations any differently. That is, section 220–b(2)(a)(1) provides no guidance on how an investigator should determine whether wages and benefits are likely owed to employees on a public contract. It is troubling that neither § 220–b(2)(a)(1), DOL regulations, nor the Bureau's Manual provide any "objective criteria for assessing whether" wages appear to be due and whether an employer has violated the prevailing wage laws. *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994). The absence of any such objective criteria means that § 220–b(2)(a)(1) does little to "minimize the possibility of arbitrary enforcement . . . ." *Id.* at 526, 114 S.Ct. 1747. It is not surprising, then, that this bare standard of "appears to be due" could not

ensure a rational investigation in this case and did not prevent withholdings that were without basis in credible and substantial facts.

In sum, the proof presented during the hearings establishes a clear or substantial likelihood that § 220–b(2)(a)(1) is unconstitutionally vague as applied, since the proof demonstrated that the statute allowed Kinn to conduct an investigation that was both arbitrary in its methods and inscrutable in its results.

### B. Substantive Due Process Claims

■■■■ In order to maintain its claim for a violation of its right to substantive due process, Diamond D must

demonstrate that the government actor's actions were arbitrary, or conscience-shocking, in a constitutional sense. Substantive due process does not provide protection against state actions that are merely incorrect or ill-advised. Therefore, most claims sounding in tort do not constitute substantive due process violations. Indeed, even intentional torts by government actors are not actionable as substantive due process violations unless they are arbitrary and discriminatory or shock the conscience.

Item 48, p. 14 (quoting *Sundbye v. Ogunleye*, 3 F.Supp.2d 254, 261 (E.D.N.Y.1998)).

In addition to the arbitrary nature of Kinn's investigation, *see supra*, the court is troubled by the excessive delays that characterized the DOL investigation and hearings; the exorbitant amounts of money that the DOL has withheld through interest and civil penalties; and the DOL's refusal to allow Diamond D to post a bond to secure the underpayment withholdings. No credible explanation was offered for certain aspects of these decisions at the hearings. As a result, the DOL's decisions on these points must be seen as arbitrary and, accordingly, a probable violation of Diamond D's right to substantive due process.

■■■■ Much like the "vague-as-applied" analysis, the court has set forth its complete findings of fact on this issue. *See supra* Preliminary Findings of Fact Parts II, VIII, and IX. Again, for the purposes of analysis, the court will now review those findings in summary form.

First, as to the delays that Diamond D has endured: while the court recognizes that Diamond D has had a hand in causing some of these delays, the DOL was still largely responsible for causing most of them. The DOL unnecessarily delayed the beginning of this investigation by many months, then further delayed resolution of the investigation by repeatedly failing to respond to Diamond D's Freedom of Information requests in a timely manner. In addition, John Loughlin did not issue a notice of hearing until after this lawsuit was filed and did not set aside enough time for hearings even though he knew that Diamond D was eager to vigorously contest the withholdings. Thus, the DOL unduly delayed resolution of these underpayment withholdings for years. In this way, the DOL was able to exert great pressure on Diamond D in an effort to force the company to submit to settlement.

Next, as to the inclusion of interest in the withholdings: there is no doubt that Labor Law § 220–b allows wage investigators to apply statutory interest to underpayment withholdings. Yet, the DOL did nothing to explain or justify Kinn's practice of applying interest for the months that the DOL simply delayed and did nothing with the file. Furthermore, there was no reasonable explanation offered for Kinn's applying months of prospective interest to Diamond D's underpayment withholdings.

Similarly, § 220–b provides for a civil penalty of *up to* 25 percent of the total amount withheld, yet this civil penalty provision is supposed to be applied with due consideration to several factors, *see* NYS Labor Law § 220–b(2)(d), and after an inquiry into the contractor's willfulness. In this case, there is no evidence that Kinn considered these issues before applying the maximum penalty. Indeed, Kinn admitted that he applied this civil penalty without any inkling as to whether Diamond D had intentionally underpaid its workers. Moreover, Kinn stated that it was customary for the DOL to levy the maximum penalty on contractors long before a hearing could be held. Without more, Kinn's routine application of the maximum civil penalty appears to be part of an effort to wear down the contractor and force a settlement that favors the DOL, regardless of the merits of a particular investigation.

Finally, the DOL has refused to accept a bond to secure the allegedly underpaid wages and benefits. As a result, the DOL continues to withhold over $1.2 million in funds otherwise owed to Diamond D. When pressed by the court on this issue, the DOL has only stated that it is the agency's policy not to accept bonds for underpayment withholdings. Yet, McMahon's testimony reveals that there are bonds in place that would cover any underpayments for which Diamond D is ultimately found responsible. Again, without more, the DOL's policy on this point appears to be part of a larger effort simply to punish contractors into submission.

Based on the foregoing preliminary findings, Diamond D has made a substantial showing that the DOL arbitrarily applied interest and penalties to the withholdings and, without good cause, refused to accept a bond to secure the underpayment withholdings. All of these decisions and actions from the DOL have contributed to the substantial and imminent harm that Diamond D now faces. Thus, Diamond has also shown a clear and substantial likelihood of success on its substantive due process claim.

## CONCLUSION

On November 6, 2000, the court instructed the parties to submit papers regarding the issue of potential remedies. Rather than submit arguments as to why a potential injunction of the DOL hearings would be unwarranted, unmanageable or unjust, counsel for the State defendants submitted a memorandum in which they set forth their overall theory of the case but did not address the issue of remedy which was of concern to the court. Item 74. This submission did not assist the court in fashioning an appropriate remedy.

Diamond D has shown a clear or substantial likelihood that the DOL's investigation and withholdings will cause it to suffer imminent and irreparable harm.

Diamond D has also established a clear or substantial likelihood that § 220–b(2)(a)(1) is unconstitutionally vague as applied and that the DOL has violated its rights to substantive and procedural due process.

The court now preliminarily enjoins the DOL's ongoing administrative proceedings. As an ancillary result of this preliminary relief, the DOL shall withdraw and rescind forthwith the notices of withholding that were filed with the New York State Department of Transportation and the Erie County Department of Public Works. *See generally* Item 48, p. 5.

So ordered.