Brian CULLEN, Plaintiff–Appellee,

v.

Dr. Herbert FLIEGNER, Joseph Ribando, Robert Quinn, Keld Alstrup, Bernard Modder, Constance Jones Phelps, Michael Santoianni, and the Tuxedo Union Free School District, Defendants–Appellants.

No. 3440, Docket 93–7685.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1993.

Decided Feb. 28, 1994.

Stephen A. Perelson, New York City, for appellants.

Robert N. Isseks, Goshen, New York, for appellee.

Before: KEARSE, JACOBS, Circuit Judges, and CARTER, District Judge.*

* Honorable Robert L. Carter, of the United States District Court for the Southern District of New York, sitting by designation.

**ROBERT L. CARTER, District Judge:**

This is a challenge to the method adopted by the Tuxedo Union Free School District to enforce New York State Education Law § 2031–a ("§ 2031–a"). Section 2031–a prohibits electioneering within 100 feet of a polling place during a school board election, and obligates the inspector of elections to place distance markers containing notice of the electioneering prohibition at a distance 100 feet from the polling place.[1] In the district court, Appellee did not challenge that portion of § 2031–a establishing the 100–foot, or "campaign free," zone. Rather, he attacked the means employed by the School District to enforce the statute on the grounds that the method chosen was not the least restrictive alternative for enforcing the statute, and thereby violated the First and Fourteenth Amendments. The district court agreed with Appellee, and so do we.

### I.

Appellee, Brian Cullen, is a tenured high school science teacher who has been employed by the Tuxedo Union Free School District (the "School District") for the past 18 years. The School District, along with its superintendent, Dr. Herbert Fliegner (the "Superintendent"), and the six members of the School District's Board of Education, are Appellants in this appeal.

On February 15, 1990, the School District filed disciplinary charges alleging that Cullen 1) in violation of previous directives, took a group of students during the weekend on an unauthorized field trip in an aircraft to conduct a scientific experiment and 2) encouraged students to expose themselves, or "moon" him, in one of his classes. There had been no previous disciplinary charges filed against Cullen. The disciplinary panel dismissed the second charge as being "of no significance," but found Cullen guilty of the first and fined him $1250. The panel indicated, however, that Cullen "is clearly a very fine teacher."

On February 13, 1992, a new disciplinary charge was filed against Cullen alleging that, despite prior directives not to do so, he ignited the aerosol spray of Binaca Breath Spray in the presence of elementary grade school students in the school cafeteria where he was serving as a cafeteria lunch supervisor. After finding Cullen guilty of this charge, the disciplinary panel suspended him for four months without pay, despite the School District's argument that Cullen should be terminated. The School District is appealing the panel's penalty decision, currently pending before the New York State Commissioner of Education.

On May 6, 1992, at the George F. Baker High School, the School District held an election for candidates for its Board of Education and for a vote on the annual budget. The Superintendent and the District Clerk, Ms. Nancy Bourke, were responsible for the conduct of these proceedings.

---

1. The complete statute reads as follows:

"**§ 2031–a. Electioneering within one hundred feet of polling place prohibited; distance markers**

1. At every election held for the office of trustee or member of a board of education and at every vote upon any proposition or issue in a school district where the election or vote is held at a different time from, and not during, the annual meeting of the district, there shall be conspicuously placed, by the inspectors of election, distance markers at a distance of one hundred feet from the polling place. Such distance markers shall indicate the prohibition contained herein and shall be so placed at least one-half hour before the opening of the polls and shall remain until the polls are closed. 2. At such elections or voting held at a different time from, and not during, the annual meeting of the district, while the polls are open no person shall do any electioneering within the polling place, or within one hundred feet therefrom in any public street, or within such distance in any place in a public manner and no banner, poster or placard on behalf of or in opposition to any candidate or issue to be voted upon shall be allowed in or upon the polling place or within one hundred feet therefrom during the election. For the purposes of this section, the one hundred foot distance shall be deemed to include a one hundred foot radial measured from the entrances, designated by the inspectors of election, to a building where such election is being held. This section shall not be deemed to prohibit the board of trustees or board of education from displaying within any polling place a copy or copies of any budget or proposition to be voted upon." N.Y. Education Law § 2031–a (McKinney 1988).

The School District did not place distance markers 100 feet (or at any distance) from the entrance to the High School during the course of the May 6, 1992 election. No written notice was posted advising the public of the electioneering prohibition, nor did anyone physically determine where the 100-foot campaign free zone actually ended. In the previous nine years (through 10 elections), the School District did not use distance markers—and indeed did not possess any such markers—in any of these elections.

At about 3:30 p.m. on May 6th, after his work day had ended (in accordance with the terms of the teachers' collective bargaining agreement), Appellee began to distribute copies of a flier protesting the fairness of the ongoing election and encouraging voters to vote "no" for the two incumbent Board of Education members, who were running unopposed. Appellee was positioned approximately 41 feet from the entrance door of the High School. At about the same time, a member of the School District staff advised the Superintendent of what Cullen was doing.

The Superintendent approached Appellee and requested that he remove himself from the steps of the High School because the law required that he be at least 100 feet from the entrance to the High School if he wanted to engage in any electioneering. Appellee replied that he was doing nothing wrong, that it was after school hours and the Superintendent could not tell him to do anything, and that he would not move unless instructed to do so by a police officer. The Superintendent repeated his order to move, and on Appellee's failure to do so called the Chief of Police, asking him to send an officer to the High School to instruct Appellee to move to an appropriate distance from the polling place.

At about 3:40 p.m., while the Superintendent was calling the police, Joseph Zanetti, the School District's Business Administrator, observed Appellee handing out fliers. Zanetti advised Appellee that he was not outside the required statutory distance and that he must cease distributing fliers there and remove himself. As he had done with the Superintendent, Cullen refused to move un-less the police asked him to. At this point, the Superintendent returned, requested that Zanetti remain as a witness, and, in Zanetti's presence, instructed Cullen to remove himself to 100 feet from the front door of the High School. Appellee again refused to move unless ordered to do so by the police.

Police officer John J. Kelly arrived at the High School shortly thereafter, and found Appellee still handing out fliers less than 100 feet from the front of the High School. The police officer told Appellee that he could not distribute the fliers within 100 feet of the High School, and that doing so violated state law. Appellee indicated to the police officer that he was not aware of the state law and that he would move. The police officer then indicated a spot where Appellee could stand that would be "well outside" the 100 foot zone.

The Superintendent observed Appellee at this new location for approximately 15 or 20 minutes until 4:15 p.m., at which time the Superintendent left the High School. Prior to leaving, the Superintendent told the District Clerk that there had been trouble with Appellee electioneering within the campaign free zone, and instructed her to call the police if she had any further problems.

At approximately 4:30 p.m., the District Clerk observed Appellee handing out fliers within 100 feet of the High School's front doors. After phoning the police, she advised Appellee that he could not hand out fliers within 100 feet of the entrance to the High School.

A second police officer soon arrived and gave Appellee a copy of New York State Election Law § 8–104, which sets forth an electioneering prohibition similar to the one contained in § 2031–a. Appellee agreed that the 100 foot prohibition extended from the front door of the High School, and the police officer then escorted Appellee to a point that they both agreed was beyond the 100 foot zone.

Nothing in the record establishes Appellee's whereabouts or activities, or if any prohibited electioneering occurred, between 4:30 p.m. and 8:30 p.m. At about 8:30 p.m., the Superintendent returned to the High School.

While he was standing inside, one or more voters came into the High School carrying Appellee's flier and told the Superintendent that one of the teachers was handing them out at the front of the steps of the High School. The Superintendent, the District Clerk, the Business Administrator and several members of the Board of Education then went outside, and Appellee was again advised that he was violating state law and was asked to move. Appellee did not move, and the Superintendent went to call the police. It is uncertain whether a police officer came to the High School this third time.

Between 8:50 p.m. and the close of the polls at 9:00 p.m., Appellee continued to hand out the fliers at the front of the steps of the High School. The Business Administrator approached Appellee and told him that what he was doing was illegal and directed him to leave. Appellee replied that he was beyond the 100–foot radius.

On February 26, 1993, a disciplinary panel established pursuant to New York State Education Law § 3020–a (the "§ 3020–a panel") heard charges that Appellee had violated § 2031–a on three separate occasions on May 6, 1992. After the presentation of the School District's case and over the objection of the School District's counsel, Appellee's counsel stated that Appellee had a right to seek a preliminary injunction staying the disciplinary proceeding because a First Amendment issue was involved, but that counsel would instead seek to submit to the § 3020–a panel a motion to dismiss based upon this First Amendment issue.

Ultimately, the School District's counsel agreed, and the § 3020–a panel agreed to hear the motion to dismiss based upon the constitutional claims only. Both sides briefed the issue, and Appellee's motion was denied.

After learning of the § 3020–a panel's denial of his motion, Appellee commenced this action in the district court for the Southern District of New York seeking to enjoin the disciplinary proceeding against him. Following the parties' stipulation to the relevant facts and oral argument, the district court rendered a decision from the bench. The court found that Appellants' prosecution of

the charges and the commencement of the disciplinary proceeding violated Appellee's First Amendment free speech rights, and so permanently enjoined Appellants from continuing with the proceeding. Appellee had sought no money damages. Judge Brieant directed Appellants to pay Appellee's legal fees in the amount of $19,082.65. This appeal followed.

## II.

Appellee contends that the School District's haphazard method of enforcement failed to provide adequate notice of the 100 foot boundary, and that therefore his conduct did not (and could not) constitute a criminal violation of § 2031–a. It follows, according to Appellee, that there was no justification for the disciplinary proceedings instituted by the School District. We agree.

Section 2031–a explicitly requires the posting of "distance markers at a distance of one hundred feet from the polling place." N.Y. Education Law § 2031–a(1) (McKinney 1988). These markers demarcate the boundary of the campaign free zone and provide notice to the public of the prohibition on electioneering within the zone. The markers are to be set up at least one-half hour before the polls open on election day, and are to remain up until the polls close. This scheme minimizes the potential for arbitrary or discriminatory enforcement by providing to the public uniform and continuous notice of what constitutes electioneering and of where electioneering is prohibited. School officials, who otherwise lack discretion to determine whether a violation of the statute has occurred, are therefore not relied upon personally to notify the public of the existence of the electioneering prohibition or to indicate the campaign free zone's boundary.

The School District disregarded this statutory notice requirement, and, instead, adopted a method of enforcement more suited to its own convenience. Its method of enforcement provided no notice of either the parameters of the campaign free zone or the nature of the electioneering prohibition itself. Nothing was used in lieu of the distance markers, nor was any one person assigned

the responsibility of monitoring the campaign free zone for electioneering violations. Moreover, the 100 foot distance from the High School has never been measured, so no School District employee even knew where the campaign free zone actually ended. In fact, there is no indication that the School District had attempted to enforce § 2031–a prior to the May 6, 1992 election.

Absent the posting of distance markers, or the functional equivalent thereof, there was no way for Appellee (or anyone else) to identify the 100 foot boundary beyond which electioneering was permitted. The Superintendent's effort to give Appellee notice of the boundary consisted of nothing more than a warning that the High School steps were within 100 feet of the polling place. Once the Superintendent had confirmed for himself that Appellee had violated the electioneering prohibition, he made no attempt either to post notice of the prohibition or to conduct regular inspections of the campaign free zone.

The two police officers summoned to the High School also failed to advise Appellee precisely where the 100 foot line was drawn. One police officer merely indicated a spot "well outside" the 100 foot zone, and the other escorted Appellee to a point safely beyond that zone. Like the Superintendent, the police officers seemed focused only on removing Appellee from the campaign free zone, and not with the importance of notifying the public of the electioneering prohibition so as to avoid similar difficulties with Appellee or others in the future.

■ It is true that irrespective of where the 100 foot boundary was located, Appellee was well aware that he was inside it when he continued electioneering on the High School steps after speaking with the Superintendent and the police. At no time, however, was Appellee advised of the precise location of the 100 foot boundary. Accordingly, the oral

statements did not (and could not) provide adequate notice of the restricted area so as to justify penalizing Appellee (or anyone else) under § 2031–a. Allowing notice to be conveyed in the manner employed by the School District would facilitate (i) the curtailment of Appellee's First Amendment right to express his views to the voters as near to the polling place as the statute permits; and (ii) the selective enforcement of the prohibition on electioneering.

■ Appellee's First Amendment interest in staking out his vantage at the 100 foot line was no less compelling than the School District's interest in ensuring that he did not cross it. Taking together everything Appellee was told by the Superintendent and the police, his only choice was to stand either *more* than 100 feet away from the polling place or *less* than 100 feet away. What he could not do, however, was exercise his statutorily protected right to stand *just* 100 feet from the polling place. The School District effectively prevented Appellee from exercising his First Amendment right to the full extent allowed under the statute (and under *Burson v. Freeman*, —— U.S. ——, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)).

■ The School District's method of enforcement also facilitated the arbitrary and discriminatory enforcement of § 2031–a. To the degree that the School District sought to enforce the electioneering prohibition at all, its efforts would appear to have been focused exclusively on the activities of Appellee, someone with whom the School District "had a past history of personal conflict." [2] By the time the polls had closed, the Superintendent, the Business Administrator, the District Clerk, the President of the Board of Education, the Vice–President of the Board of Education and one additional member of the Board of Education had all, alone or together, confronted Appellee over his elec-

**2.** It may be argued that Appellee himself was in a position to know if such selective enforcement actually occurred, and would have offered evidence to that effect. As the district court noted, however, "in a contested election there may have been other people standing within the 100 feet distance and speaking with each other or greeting each other or making comments." The

School District's failure to provide adequate notice of the 100 foot boundary meant that no one (other than Appellee) would be warned of the electioneering prohibition and thereby inhibited from discussing the issues and promoting the candidates right up to the polling booths themselves.

tioneering activities. When the Superintendent left the High School at 4:15 p.m., he told the District Clerk specifically that there had been "trouble" with Appellee over his electioneering, and that she should call the police if there were any further problems.

In fact, the School District's ability to document Appellee's activities is in dramatic contrast to the virtual absence of information about the activities of others. The School District cannot establish whether anyone violated the electioneering prohibition prior to 3:30 p.m.—it knows only that Appellee did so approximately at that time. Further, it cannot establish whether anyone other than Appellee violated the prohibition after 3:30 p.m.—it has only documented Appellee's activities. This failure demonstrates that the School District's enforcement method is susceptible to discriminatory or arbitrary application. A government body charged with enforcing a law that seeks to preserve the delicate balance between the exercise of First Amendment rights and the promotion of fair and honest elections should not be permitted to ignore safeguards designed to preserve that balance, and then, at day's end, be able to report only on the activities of a single individual with whom bad blood already existed.

In short, Appellee did not violate § 2031–a because the School District did not provide the notice required by that statute.[3] Holding otherwise would infringe upon Appellee's First Amendment (and statutory) right to electioneer 100 feet from the polling place and make possible the selective enforcement of the prohibition on electioneering.

### III.

▮▮▮▮ Appellants contend that the district court should have abstained from deciding Appellee's constitutional claims. The federal abstention doctrine, first enunciated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), is based on the premise that ordinarily a state proceeding provides an adequate forum for the vindication of federal constitutional rights, *Kugler v. Helfant*, 421 U.S. 117, 124, 95 S.Ct. 1524, 1530, 44 L.Ed.2d 15 (1975), and so due deference ought to be paid the principles of comity and federalism. *Younger*, 401 U.S. at 44, 91 S.Ct. at 750. *Younger* abstention applies to state judicial and administrative proceedings, so long as the state court has a means of reviewing constitutional claims. *See, e.g., Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627–29, 106 S.Ct. 2718, 2722–24, 91 L.Ed.2d 512 (1986).[4]

▮▮▮▮ Nevertheless, federal courts should still afford injunctive relief to a plaintiff who successfully establishes "the kind of irreparable injury, above and beyond that associated with the defense of a single prosecution brought in good faith, that ha[s] always been considered sufficient to justify federal intervention." *Younger*, 401 U.S. at 48, 91 S.Ct. at 752. Intervention would still be warranted upon a showing of "bad faith, harassment or any other exceptional circumstance that would call for equitable relief." *Id.* at 54, 91 S.Ct. at 755. Generally, for such a showing to be made, the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome. *See Kugler*, 421 U.S. at 126 n. 6, 95 S.Ct. at 1531 n. 6. But, a refusal to abstain is also justified where a prosecution or proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to

---

3. This conclusion is buttressed by the fact that no arrests were made by the police and no criminal charges were filed by the District Attorney.

4. Before a federal court can abstain under the *Younger* doctrine, three factors must be present. First, there must be an ongoing state proceeding. *See Christ the King Regional High School v. Culvert*, 815 F.2d 219, 224 (2d Cir.), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 63 (1987). Second an important state interest must be implicated in that proceeding. *Id.* Third, the federal plaintiff must have an adequate opportunity for judicial review of his constitutional claims during or after the proceeding. *Id.* In his brief to this court, Appellee submitted *sub judice* that the three *Younger* doctrine factors were present, and so we assume *arguendo* that, for the purposes of this decision, they are present. Further, because we believe that the district court based its determination not to abstain upon the applicability of the "bad faith" exception to this case, we confine our affirmance to the district court's conclusion.

harass. *E.g., Lewellen v. Raff,* 843 F.2d 1103, 1109–10 (8th Cir.1988), *cert. denied,* 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989) (bad faith prosecution where brought in retaliation for exercise of First Amendment rights); *Rowe v. Griffin,* 676 F.2d 524 (11th Cir.1982) (bad faith prosecution where brought after assurances of immunity to defendant).

■■■■ In such cases, a showing of retaliatory or bad faith prosecution establishes irreparable injury for the purposes of the *Younger* doctrine, *Bishop v. State Bar of Texas,* 736 F.2d 292, 294 (5th Cir.1984); *Shaw v. Garrison,* 467 F.2d 113, 119–21 (5th Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972), and the expectations for success of the party bringing the action need not be relevant. *See, e.g., Lewellen,* 843 F.2d at 1109–10 (injunction justified regardless of expectations where prosecution brought to discourage exercise of constitutional rights). Abstention would serve no purpose because a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, *see, e.g., id.* at 1110, or, equally, in continuing actions otherwise brought in bad faith, thereby reducing the need for deference to state proceedings.

■■■ Although the district court did not explicitly address the abstention doctrine in its opinion, it found that the disciplinary charges had been brought in "bad faith." We, therefore, assume that the district court concluded that the bad faith exception to the Younger doctrine was applicable. Although the specific findings in the district court's opinion were few in number, they nevertheless provide the basis for the court's apparent conclusion that Appellants sought Cullen's termination, and that the charges that Cullen violated § 2031–a were brought in retaliation for the exercise of Cullen's First Amendment right to protest the school board elections.

Appellants, according to the district court, had a "past history of personal conflict" with Cullen, and their corresponding desire "to do something about" him rose to the "level of animus." More specifically, the court took note of the "charges and hearings and imposition of fines" that preceded the School Dis-

trict's attempt to enforce § 2031–a against Cullen. With respect to this enforcement, the district court found that Appellants had pursued Appellee in a "strictly *ad hominem*" manner, and the charges themselves, along with the disciplinary proceeding that followed, "imposed a chilling effect" on Appellee's First Amendment rights.

Presumably, it was on these findings that Judge Brieant grounded his determination that the bad faith exception to the *Younger* doctrine applied. Although the exception has been deemed a "narrow" one, *see Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 1212, 43 L.Ed.2d 482 (1975), we do not find the district court's determination to be clearly erroneous. *See* Rule 52(a), Fed.R.Civ.P. Because the State of New York cannot have a legitimate interest in the disciplinary proceeding, permitting it to continue would not serve the purposes of the *Younger* doctrine, and so the district court's decision not to abstain is affirmed.

## IV.

Appellants claim that Appellee waived his right to have his constitutional claims heard by the district court. They argue that by seeking to have his motion to dismiss heard by the § 3020–a panel after the presentation of Appellants' case and by basing this motion upon alleged First Amendment violations, Appellee lost the chance to bring his First Amendment claim directly in federal court.

■■■ Article III does not confer upon litigants an "absolute right" to have all claims decided by an Article III court. *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 848, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986). This "personal right" is subject to waiver, much like other personal rights that define the procedures used to try civil and criminal matters. *Id.* at 848–49, 106 S.Ct. at 3255; *Collins v. Foreman,* 729 F.2d 108, 120 (2d Cir.), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). Such a waiver may be either implicit or explicit, *see Schor,* 478 U.S. at 849, 106 S.Ct. at 3255, however, a litigant's consent to submit a claim to the jurisdiction of a non-Article III forum must be freely and voluntarily given. *Collins,* 729

F.2d at 120; *Pacemaker Diagnostic Clinic, Inc. v. Instromedix*, 725 F.2d 537, 543 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *U.S. v. Dobey*, 751 F.2d 1140, 1143 (10th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 52 (1985).

■ We are uncomfortable finding an explicit waiver where as here the record is devoid of the slightest indication that either Appellee's counsel or any member of the § 3020–a panel possessed an awareness that Appellee's right to have his claims heard by an Article III forum might be in jeopardy of being waived. *See Johnson v. Zerbst*, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (it would be "fitting and appropriate for [a waiver] determination to appear upon the record"); *U.S. v. Crutcher*, 405 F.2d 239, 244 (2d Cir.1968), *cert. denied*, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969) ("the preferred practice [for obtaining a waiver] would be for the court to advise the defendant of his rights … and, if the defendant so desires, obtain an intelligent and knowing waiver on the record"). Further, we have not been made aware of any off-the-record conversations between Appellee and any member of the § 3020–a panel in which a waiver might have been effected, *see Polizzi v. U.S.*, 926 F.2d 1311, 1319 (2d Cir.1991), or of any other explanation or personal recollection by any member as to why a waiver might not have appeared on the record. *See id.* at 1320–21. In essence, there is no evidence that any panel member showed an understanding that a waiver might possibly have been effected—the possibility of waiver was neither broached nor hinted at.

Appellee likewise gave no indication that his request to have the § 3020–a panel hear the motion to dismiss might have effected a waiver of his right to bring the constitutional claims directly in federal court. No questions were posed either to Cullen or his counsel to elicit or confirm whether he had consented to waive his Article III rights. Rather, his counsel stated only that Cullen sought to have the § 3020–a panel decide the motion rather than requiring him to continue further with the disciplinary proceeding or "forcing" him to bring a claim in federal court, which he stated Cullen would do if the § 3020–a panel refused to hear the motion.

■ Appellee, nonetheless, may have waived his right implicitly. *See Schor*, 478 U.S. at 849, 106 S.Ct. at 3255. In *Schor*, the Court found that Schor had effectively waived his right to appear before an Article III court after he first insisted that a common law counterclaim against him be brought in the administrative tribunal where he had already initiated a related statutory matter, and then, after losing on this counterclaim, sought to remove the counterclaim to federal court. *Id.* at 849–50.

However, unlike *Schor*, Cullen did not seek to manipulate forums or otherwise abuse the judicial process, nor, in fact, did he initially choose the non-Article III forum to hear his claim. On this basis, we cannot find that an implicit waiver was freely and voluntarily given.

## V.

The district court awarded Appellee attorney's fees in the amount of $19,082.65. Part of the award was for time spent in preparation for, and attendance at, the disciplinary proceeding against Appellee. It is this part of the award that Appellants now challenge.

■ The Supreme Court has emphasized that the district court has discretion in determining the amount of a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Upon appeal of a fee award, "the reviewing court must evaluate its reasonableness with appropriate deference." *Webb v. County Bd. of Educ.*, 471 U.S. 234, 244, 105 S.Ct. 1923, 1929, 85 L.Ed.2d 233 (1985).

■ A federal court may award attorney's fees to a prevailing civil rights litigant. 42 U.S.C.A. § 1988 (West Supp.1993).[5] Attorney's fees may also be awarded for work done in a prior administrative proceeding which " 'was both useful and of a type ordi-

---

5. The district court indicated in its opinion that Appellants had conceded that Appellee was enti-   tled to recover his attorney's fees under § 1988.

narily necessary to advance' " the subsequent § 1988 civil rights litigation. *N. Carolina Dept. of Transp. v. Crest St. Community Council, Inc.*, 479 U.S. 6, 15, 107 S.Ct. 336, 341, 93 L.Ed.2d 188 (1986); *Webb*, 471 U.S. at 243–44, 105 S.Ct. at 1928–29.

■ Appellee is not asking that all fees incurred in connection with the disciplinary proceedings be reimbursed, but rather only a "discrete portion" of the fees so incurred. *See Webb*, 471 U.S. at 243, 105 S.Ct. at 1928; *N. Carolina Dept. of Transp.*, 479 U.S. at 15, 107 S.Ct. at 341. The district court found both "useful" and "ordinarily necessary" that portion of the work done by Appellee's counsel in preparing for and in attending the disciplinary proceeding. Further, Appellee appropriately excluded from his request those fees incurred that were particular to the disciplinary proceeding and could not be transferred to the district court action. Given the particular nexus between the work in the disciplinary proceeding for which fees were requested and the demands of the district court action, we see no reason to reverse the district court's finding that this "discrete portion" of counsel's work be reimbursable to Appellee.

## CONCLUSION

We affirm the district court's decision permanently enjoining Appellants from bringing or maintaining any disciplinary proceedings against Appellee arising out of the events of May 6, 1992 and the district court's award of attorney's fees to Appellee.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent.

Leaving aside my disagreement with the majority's hypothesis of possible selective enforcement of the prohibition against electioneering within 100 feet of the High School, a matter that is purely speculative since the plaintiff apparently has never claimed even to have seen anyone else who might have been electioneering in the area where he was, I think the majority is far wide of the mark in holding that the defendants violated the plaintiff's constitutional rights by seeking to hold him responsible for violating N.Y. Education Law § 2031–a (McKinney 1988).

First, I disagree with the majority's view that the plaintiff in this case "did not violate § 2031–a because the School District did not provide the notice required by that statute." Majority opinion *ante* at 103. Section 2031–a(2) provides that "no person shall do any electioneering within the polling place, or within one hundred feet therefrom...." Though § 2031–a(1) requires the posting of notices, the prohibition in § 2031–a(2) is not conditioned on the posting of notices. *Compare* § 2031–a *with* N.Y. Education Law § 2609(4–a)(b) (McKinney 1981) (*"Where such markers are so placed* and the polls are open, no person shall do any electioneering within the polling place, or within one hundred feet therefrom...." (emphasis added; emphasized language does not appear in § 2031–a(2))).

Further, even assuming that the plaintiff was ignorant of the law that forbade him to engage in electioneering activities within 100 feet of the school, and that his ignorance of the law gave him an excuse initially for electioneering activities within that range, he plainly knew of the prohibition after a policeman was called and removed him from the 100–foot area.

Finally, even accepting the proposition that without physical signs demarking the area 100 feet from the High School, this plaintiff did not know just how far away from the High School 100 feet extended, I cannot accept the proposition that he did not know that the High School steps were within 100 feet of the school.

As the majority concedes, "irrespective of where the 100 foot boundary was located, Appellee was well aware that he was inside it when he continued electioneering on the High School steps after speaking with the Superintendent and the police." *Ante* at 102. I do not agree with the majority that the failure of the school board to post markers showing the plaintiff where to stand in order to be *"just"* 100 feet away, *ante* at 102 (emphasis in original), gave him license to stand 0 feet away in the guise of lack of notice and to hold defendants liable for allegedly violat-

ing his right to campaign exactly 100 feet away.