tion under New York law whether a criminally usurious loan is void.

DIAMOND "D" CONSTRUCTION CORP., Plaintiff–Appellee,

v.

James J. McGOWAN, Commissioner of Labor of the State of New York, Department of Audit and Control, State of New York, Michael J. O'Connell, Department of Audit and Control, State of New York, Ronald Kinn, individually and in his capacity as Public Work Wage Investigator employed by the DOL, Dale Stanley, individually and in his capacity as an employee of the DOL, Defendants–Appellants,

New York State Department of Labor ("DOL"), Bureau of Public Works, Brian Robison, individually and in his capacity as Senior Public Work Wage Investigator employed by the DOL, Counter–Defendants–Appellants,

County of Erie, Nancy Naples, Erie County Comptroller, Defendants.

Docket No. 01–7055.

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 2001.

Decided March 1, 2002.

192

Seth Kupferberg, Assistant Attorney General for Eliot Spitzer, Attorney General of the State of New York (Daniel Smirlock, Deputy Solicitor General, M. Patricia Smith, Assistant Attorney General in Charge of Labor Bureau, and Pico Paul

Ben–Amotz, Assistant Attorney General, of counsel) for Defendants–Appellants and Counter–Defendants–Appellants.

Henry W. Killeen, III, Killeen & Killeen, Orchard Park, NY (Anna Marie Richmond and Timothy J. Greenan, of counsel) (Brian P. Fitzgerald, Napier, Fitzgerald & Kirby, Buffalo, NY, on the brief) for Plaintiff–Appellee.

Nancie G. Marzulla, Defenders of Property Rights, Washington, DC, for Amicus Curiae Defenders of Property Rights.

Before: McLAUGHLIN, POOLER, Circuit Judges, and Sand, District Judge.[*]

McLAUGHLIN, Circuit Judge.

In this case we must apply bedrock principles of federalism, embodied in the *Younger* abstention doctrine. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). We are asked to determine whether a federal court was empowered to enjoin ongoing state administrative proceedings brought by the New York State Department of Labor ("DOL") against a contractor, Diamond "D" Construction Corporation ("Diamond D"). More precisely, we must inquire whether the manner in which the DOL's investigation and administrative proceedings were conducted, coupled with the precarious financial position inflicted upon Diamond D, created sufficient circumstances to trigger either or both of the established exceptions to the *Younger* abstention doctrine. Because we hold that the DOL's conduct and its effects on Diamond D are not encompassed by either exception, we conclude that the district court was required by *Younger* to abstain from taking jurisdiction over this claim for injunctive relief.[1] Therefore, we vacate the preliminary injunction and remand this case to the district court.

## BACKGROUND

### A. New York's Statutory Scheme

The New York Constitution and New York Labor Law provide that laborers employed by public works contractors must be paid the "prevailing rate of wages" for their trade in the New York locality where the work is done. N.Y. Lab. Law § 220(3) (McKinney 2001); *see also* N.Y. Const., Art. I, § 17. This is known as the "prevailing wage law." The DOL is empowered to investigate, either *sua sponte* or upon a worker's complaint, whether a contractor has complied with the prevailing wage law. N.Y. Lab. Law §§ 220(7), 220–b(2)(c).

If, upon investigation, the DOL determines that laborers have been paid less than the prevailing wage, the DOL may, prior to any hearing or administrative process, withhold payment on the contract in an amount sufficient to satisfy: (1) the payments that "appear to be due" to the workers; (2) interest of 16%, running from the date of the alleged underpayments; and (3) a civil penalty of up to 25% of the total alleged amount of underpayment. *Id.* § 220–b(2)(a), (c) & (d); N.Y. Banking Law § 14–a(1) (McKinney 2001). The amount of underpayment is approximated after examination of the contractor's payroll records, or if those records are not made available, the best available evidence.

---

[*] The Honorable Leonard B. Sand, United States District Judge for the Southern District of New York, sitting by designation.

1. On appeal, the DOL also asserted that the Eleventh Amendment barred Diamond D's federal action and challenged the district court's conclusion that Diamond D had established a likelihood of success on the merits of its substantive due process claim. Because we conclude that *Younger* abstention resolves this case, we do not reach these alternative arguments.

E.g., Alphonse Hotel Corp. v. Sweeney, 251 A.D.2d 169, 674 N.Y.S.2d 351, 352 (1st Dep't 1998). The withholding will be implemented when the DOL sends a "notice of withholding" to the financial officer of the public body sponsoring the contract. N.Y. Labor Law § 220–b(2)(a).

Once the DOL issues the notice of withholding, the contractor is entitled to an administrative hearing before the DOL to determine if, in fact, there have been underpayments. N.Y. Lab. Law § 220–b(2)(c). Such hearings "shall be expeditiously conducted." Id. § 220(8).

If the contractor does not get relief in the administrative hearing, it may challenge the administrative findings in an Article 78 proceeding before the Appellate Division of the New York State Supreme Court. Id. § 220–b(2)(e); N.Y. C.P.L.R. § 7803(4). The contractor may also mount constitutional challenges to the DOL investigation and administrative proceeding in the Article 78 action. N.Y. C.P.L.R. § 7803(3); c.f. Solnick v. Whalen, 49 N.Y.2d 224, 230–31, 425 N.Y.S.2d 68, 401 N.E.2d 190 (1980) (approving procedure of raising constitutional objections to administrative reimbursement rate decision in Article 78 proceeding). The administrative proceeding, in contrast, is limited solely to the determination of whether the prevailing wage law was violated.

## B. Procedural History

As it considered this case, the district court published a troika of opinions, the last of which made exhaustive factual findings concerning the DOL's investigation of Diamond D and the subsequent administrative proceedings. Diamond "D" Constr. Corp. v. New York State Dep't of Labor Bureau of Pub. Works, 142 F.Supp.2d 377 (W.D.N.Y.2001) ("Diamond D III "). We presume familiarity with that opinion and the two that preceded it. See Diamond "D" Constr. Corp. v. New York State Dep't of Labor Bureau of Public Works, 110 F.Supp.2d 200 (W.D.N.Y. 2000) ("Diamond D II "); Diamond "D" Constr. Corp. v. New York State Dep't of Labor Bureau of Public Works, 105 F.Supp.2d 167 (W.D.N.Y.2000) ("Diamond D I "). Therefore, we need only offer an abbreviated version thereof, recounting just those facts and events necessary to understand our holding in this case.

Diamond D is a contractor that derives significant revenue from public contracts for road construction. Recently, Diamond D has served as the general contractor for several road construction projects in western New York, including the three projects at issue here. The New York State Department of Transportation ("DOT") was the sponsoring agency for two of these projects. The third was sponsored by the Erie County Department of Public Works.

## 1. The DOL Investigation

In June 1997, two Diamond D employees sent written complaints to the DOL alleging underpayment of wages by Diamond D. Eight months after receiving the complaints, the DOL assigned Ronald Kinn to investigate the allegations. Kinn requested payroll records from Diamond D for the three public works contracts called into question. Diamond D initially refused to comply with Kinn's request. Kinn therefore conducted his wage investigation using other available evidence.

From the DOT and Erie County, Kinn obtained most (but not all) of the certified Diamond D payroll records that it was required to submit for review pursuant to its contracts with the sponsoring agencies. However, Kinn apparently placed greater reliance on records kept by the on-site engineers and inspectors employed by the sponsoring agencies. These latter records generally included a count of the number of workers and pieces of equipment, tracked the volume of materials used and

charted the progress of the project. They did not include a detailed list of the number of hours worked by individual employees or the classification of the work performed.

According to one of the on-site agency officials that Kinn consulted, these records amount to little more than a handy way for the sponsoring agency to get a rough idea of the men, equipment and material on a job. Nevertheless, Kinn relied extensively on agency records, even when they apparently conflicted with the certified payrolls he had obtained from the sponsoring agencies and even though several on-site officials expressly told him that the agency records could not be reliably used to determine accurately the number of hours worked by individual workers or the type of work performed. Rounding out his investigation, Kinn interviewed a few Diamond D employees, including the complainants, and obtained a smattering of pay stubs and W–2 forms. Kinn was rebuffed in his efforts to interview Diamond D management.

Kinn then set about estimating the amount of underpayments to Diamond D workers. Using the evidence he had gathered and drawing other inferences from his investigation, Kinn claimed to have constructed estimates of the number of workers on each job site on each day, the number of hours worked by each worker and the classification of work performed by each worker. Thus, Kinn supposedly reconstructed, on a daily basis, the events that took place on each project. However, the district court found that Kinn's methods of estimation were not nearly so precise.

• With regard to the number of workers, in addition to the people listed in the agency reports and the certified payrolls, Kinn assumed that there was at least one operator for each piece of equipment present on a job site. He made this assumption even though the on-site agency officials told him it was baseless, as a single worker could, and often did, operate more than one piece of equipment during the course of the day. If Kinn was not able to identify who the supposed operator of the equipment was, he dubbed the worker "unknown 1" or "unknown 2." Thus, for one day, based on the equipment present at the job site, Kinn concluded that there were six operators (including two "unknowns"), even though the certified payroll indicated two operators and the agency report showed only one operator.

• When it came to calculating the number of hours worked by each individual, Kinn indulged in an even more sweeping assumption: Diamond D laborers generally worked at least ten hours each day. Kinn employed this assumption even though it was directly contradicted by information in his possession. For instance, Kinn presumed ten-hour days for one employee when the daily entries in that employee's own diary (which was in Kinn's possession) frequently listed less than ten hours.

• Finally, when it came to classifying the work performed by each employee, the district court found that Kinn made no distinction between the work performed at the job site and off-site work, such as manufacturing guardrails at the Diamond D machine shop. Kinn assumed every employee spent his entire work day at the job site, and thus was entitled to the higher prevailing wage for on-site work. Thus, if a certified payroll indicated that an employee worked less than ten hours on-site, Kinn (rather than inquire whether the employee had done off-site work) simply assumed that the employee worked ten hours on-site and had not been paid for the hours not indicated in the payroll. Kinn employed this technique fully knowing that it was wrong. He testified that not only was he aware of the on-site/off-site distinction, but also that Diamond D employees worked a significant number of hours off-site.

• Using these inscrutable methods, Kinn eventually concluded that Diamond D had grossly underpaid its workers, arriving at an "estimated underpayment" of almost $700,000 across the three projects investigated. Kinn then applied the statutory rate of interest (16%), for periods of four or five years. The interest ran from the date the underpayments allegedly began (rather than the dates each underpayment was made). The interest on the underpayments for all three projects totaled more than $470,000. Kinn then applied the maximum civil penalty allowed under the prevailing wage law, 25% of the underpayment plus interest. These civil penalties alone surpassed $290,000. Thus, in October 1999, as a result of Kinn's investigation and underpayment estimates, the DOL issued withholding notices on the three projects in the aggregate amount of more than $1.4 million. Kinn then sent his files to the DOL for review and for Diamond D's administrative hearing.

## 2. The Federal Court Action

The entry of the withholding notices forced Diamond D into an untenable financial position. It was faced, on one hand, with a cash crisis created by the notices of withholding that were tying up $1.4 million, and on the other, by its inability to obtain new work because its insurer would not bond future projects until those withholding notices were resolved. To stave off insolvency, Diamond D urgently needed administrative review of Kinn's investigation. However, several months passed and the DOL had not yet moved to begin the administrative hearings to which Diamond D was entitled.

Faced with narrowing options, in April 2000, Diamond D filed the instant action in the United States District Court for the Western District of New York (Curtin, J.). Diamond D's lawsuit alleged that the DOL's investigation and subsequent refusal to schedule hearings violated its due process rights. Diamond D sought a preliminary injunction to enjoin any DOL administrative proceedings and to require the DOL to withdraw the notices of withholding. Diamond D also sought money damages pursuant to 42 U.S.C. § 1983 against the state official defendants in their individual capacities.[2] Only after this lawsuit was filed did the DOL finally issue a notice of hearing to Diamond D, but even then, the DOL scheduled just three days of hearings—nowhere near enough time for the comprehensive challenge Diamond D wished to mount against Kinn's "estimates."

The district court initially denied Diamond D's request for injunctive relief, finding that: (1) the *Younger* abstention doctrine precluded the court from enjoining the state administrative proceedings; and (2) the Eleventh Amendment would likely bar the release of the withheld funds. *Diamond "D" I*, 105 F.Supp.2d at 175–83. The district court recognized that, in light of its ruling on *Younger* abstention, "the only relief that the court might prudently award would be an order directing the DOL to hold its hearings without any further delay." *Id.* at 178. Additionally, the district court found it "curious that plaintiff never petitioned the appropriate State court to issue a writ of mandamus that would have directed the DOL to hold its post-deprivation hearing without any further delay." *Id.*

Diamond D moved for reconsideration of the district court's ruling, and the court

---

**2.** We deal herein only with the claim for injunctive relief, it being well established that *Younger* abstention is inappropriate on a claim for money damages. *See, e.g., Rivers v. McLeod*, 252 F.3d 99, 101–02 (2d Cir.2001) ("[A]pplication of the *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983....").

reversed itself in part by scheduling evidentiary hearings to resolve whether: (1) the DOL acted in bad faith; and (2) the DOL's investigation and proceedings violated Diamond D's substantive due process rights. *Diamond "D" II*, 110 F.Supp.2d at 209. In its decision, the district court noted that settlement discussions had consumed the first three days of the DOL administrative hearings and that the next hearing day was scheduled for August 28, 2000. *Id.* at 202. Against this background, the district court found "that the extent of progress at the DOL hearings will be relevant to this court's inquiry into whether the DOL has violated Diamond D's constitutional right to procedural and substantive due process." *Id.* The district court further suggested that Diamond D might be able to overcome the Eleventh Amendment's jurisdictional bar under the authority of *Associates of Surrogates and Supreme Court Reporters v. New York*, 940 F.2d 766 (2d Cir.1991). *Diamond "D" II*, 110 F.Supp.2d at 204–06. The court, however, continued to express puzzlement over Diamond D's failure to seek a writ of mandamus in state court. *Id.* at 207.

While the district court heard evidence on Diamond D's preliminary injunction request, the DOL administrative hearings continued. By the time the district court issued its final decision on January 5, 2001, the DOL had held thirty days of hearings and had scheduled thirty-eight more.

After completing its evidentiary hearings, the district court granted Diamond D's motion for a preliminary injunction. It held that while all the conditions for applying *Younger* abstention were met, the DOL's investigation was so arbitrary, and its impact on Diamond D so severe, that both of the established exceptions to the *Younger* doctrine—"bad faith" and "extraordinary circumstances"—were satisfied in this case. *Diamond "D" III*, 142 F.Supp.2d at 398–402. The district court failed, however, to address Eleventh Amendment immunity. Having found that retaining federal jurisdiction was appropriate, the court concluded that Diamond D would suffer irreparable harm in the absence of an injunction and had also established a likelihood of success on the merits of its substantive due process claim. *Id.* at 406. The district court thus enjoined the DOL's ongoing administrative proceedings and ordered the DOL to withdraw all the notices of withholding. *Id.* The DOL now appeals from that order.

## DISCUSSION

We hold that the district court erred in its conclusions that the "bad faith" and the "exceptional circumstances" exceptions to the *Younger* doctrine of mandatory abstention were satisfied in this case.

Because we find that *Younger* abstention is mandated in this case, we need not address the district court's factual findings. However, assuming the district court's characterization of the DOL's investigation, Diamond D's financial condition, and the pace of the DOL administrative proceedings is accurate, we conclude that these circumstances do not come within either of the tightly defined exceptions to the *Younger* abstention doctrine.

### A. Standard of Review

 Generally, we review a district court's decision to grant or deny a preliminary injunction only for abuse of discretion. *E.g., Zervos v. Verizon New York, Inc.,* 252 F.3d 163, 167 (2d Cir.2001). However, when *Younger* applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter. *Colorado Water Conserv. Dist. v. United States,* 424 U.S. 800, 816 n. 22, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Thus " 'we must review de novo the essentially legal determination of whether the requirements for abstention have been met.' " *Schlagler v. Phillips,* 166 F.3d 439, 441 (2d Cir.1999) (quoting *Brooks v. New*

*Hampshire Supreme Court,* 80 F.3d 633, 637 (1st Cir.1996)). This *de novo* standard of review "supervenes the abuse of discretion inquiry." *Brooks,* 80 F.3d at 637. Furthermore, while we review the district court's findings of fact only for clear error, *Cullen v. Fliegner,* 18 F.3d 96, 104 (2d Cir.1994) (citing Fed.R.Civ.P. 52(a)), whether those facts come within the ambit of either the "bad faith" or "extraordinary circumstances" exceptions to the *Younger* abstention doctrine is a mixed question of law and fact that we must also review *de novo. C.f. Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 1685, 149 L.Ed.2d 674 (2001) (applying *de novo* review to lower court's scrutiny of punitive damages' award because trial judge's determination of "gross excessiveness" and like concepts "acquire more meaningful content through case-by-case application").

#### B. *Younger* Abstention

■ *Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings. *Younger,* 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Although the *Younger* abstention doctrine was born in the context of state criminal proceedings, it now applies with equal force to state administrative proceedings. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, "a state proceeding provides an adequate forum for the vindication of federal constitutional rights." *Cullen,* 18 F.3d at 103 (citing *Kugler v. Helfant,* 421 U.S. 117, 124, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975)). Therefore, giving the respect to our co-equal sovereigns that principles of "Our Federalism" demand, we generally

prohibit federal courts from intervening in such matters. *Younger,* 401 U.S. at 44, 91 S.Ct. 746; *see also Cullen,* 18 F.3d at 103.

*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Grieve v. Tamerin,* 269 F.3d 149, 152 (2d Cir.2001). The parties here agree that all three conditions are satisfied.

■ Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of "bad faith, harassment or any other unusual circumstance that would call for equitable relief." *Younger,* 401 U.S. at 54, 91 S.Ct. 746. However, a plaintiff who seeks to head off *Younger* abstention bears the burden of establishing that one of the exceptions applies. *See Kirschner v. Klemons,* 225 F.3d 227, 235–36 (2d Cir.2000). Eager to assume this burden, Diamond D contends that this case falls within both the "bad faith" and the "extraordinary circumstances" exceptions. We are not persuaded.

#### 1. Bad Faith

■ . Like the *Younger* abstention doctrine itself, the genesis of the so-called bad faith exception was in the context of criminal prosecutions. In a companion case to *Younger,* the Supreme Court expanded on *Younger's* conception of bad faith, explaining that abstention may be inappropriate "in cases of proven harassment or prosecutions undertaken by state officials in bad faith without hope of obtaining a valid conviction . . . ." *Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971). As the application of *Younger* ab-

stention evolved beyond the criminal realm, the language of the bad faith exception became more generic. So, now, for a federal plaintiff to invoke the bad faith exception, "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome." *Cullen*, 18 F.3d at 103. Thus, for example, we have found that a refusal to abstain would be justified where a "proceeding has been brought to retaliate for or to deter constitutionally protected conduct, or where a prosecution or proceeding is otherwise brought in bad faith or for the purpose to harass." *Id.* at 103–04.

■ Our most recent cases concerning the bad faith exception have further emphasized that the subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry. *See Schlagler*, 166 F.3d at 442–43; *see also Kirschner*, 225 F.3d at 236–37. A state proceeding that is legitimate in its purposes, but unconstitutional in its execution—even when the violations of constitutional rights are egregious—will not warrant the application of the bad faith exception. *See Schlagler*, 166 F.3d at 443–44. To invoke this exception, the federal plaintiff must show that the state proceeding was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive. *See id.* at 442–44.

This requirement is reflected in our decisions. In *Cullen*, a case much relied upon by Diamond D, a teacher was disciplined after he distributed leaflets opposing the re-election of certain school board members. Cullen argued that the proceeding against him was initiated in retaliation for the exercise of his First Amendment rights. Cullen sued in federal court to stop the disciplinary proceedings, and the district court issued an injunction. On appeal, Cullen argued that *Younger* should not apply because the disciplinary proceeding was brought in bad faith. We affirmed the district court's injunction, holding that the district court's findings of a "past history of personal conflict" between Cullen and the school board, and the "strictly *ad hominem*" manner in which the school board had disciplined him were sufficient to establish that the school board disciplinary proceeding was retaliatory in nature and calculated to chill First Amendment expressive activity critical of the school board. *Cullen*, 18 F.3d at 104. Therefore, we concluded, "[b]ecause the State of New York cannot have a legitimate interest in the disciplinary proceeding, permitting it to continue would not serve the purposes of the *Younger* doctrine. . . ." *Id.*

In a later case, we distinguished *Cullen*, when we vacated a district court's injunction halting a criminal proceeding that allegedly violated the defendant's First Amendment rights. *Schlagler*, 166 F.3d at 442–44. Schlagler was charged with aggravated harassment for violating a statute which barred communication "with the intent to harass, annoy, threaten or alarm another person," "in a manner likely to cause annoyance or alarm." N.Y. Penal Law § 240.30(1) (McKinney 1997). The district court concluded that, although the prosecutor had no animus toward the defendant, the statute was facially unconstitutional, and therefore, any prosecution under it could only be in bad faith. We disagreed, ruling that because the prosecution was not retaliatory or otherwise illegitimate in its motivation, and, in fact, was nothing more "than a straightforward enforcement of the laws of New York, [the] case does not fall within the bad faith exception as set forth in *Cullen*." *Schlagler*, 166 F.3d at 443–44.

When one recalls the basic rationale for *Younger* abstention, this requirement of subjective bad faith makes good sense. *Younger* is grounded in concern for comity

toward our co-equal sovereigns. This comity and the deference to states it often requires is the cornerstone of our federal system. We give states the first opportunity—but not the only, or last—to correct those errors of a federal constitutional dimension that infect its proceedings. *See Younger*, 401 U.S. at 44, 91 S.Ct. 746 ("the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."). We give states this opportunity to correct their own mistakes because such deference reaffirms the competence of the state courts, and thereby enhances the dignity of the state sovereign.

Federal interference with state proceedings, because it necessarily presumes that state court review will be inadequate, affronts the dignity of the state sovereign. However, as we recognized in *Cullen*, a state has no interest in continuing actions brought with malevolent intent. 18 F.3d at 104. Thus, it is only when the state proceeding is brought with no legitimate purpose that this state interest in correcting its own mistakes dissipates, and along with it, the compelling need for federal deference.

■ It is against the tableau of these principles that we must examine the district court's decision to invoke the bad faith exception. Here, the district court found that:

> [T]he DOL has unnecessarily delayed the progress of the investigation and hearings and has withheld funds on the basis of an arbitrary investigation. In this way, the DOL has evidenced an *intent to harass* and coerce Diamond D into paying the underpayment withholdings, regardless of whether the withholdings have any basis in fact.

*Diamond D III*, 142 F.Supp.2d at 398 (emphasis added).

Diamond D emphasizes the specific language of *Cullen* that abstention may not be appropriate where the proceeding was "brought in bad faith or for the *purpose to harass.*" *Cullen*, 18 F.3d at 103–04 (emphasis added). For Diamond D, the district court's invocation of the phrase "intent to harass" settles the issue. The district court, however, never found that when the DOL *brought* its administrative proceedings against Diamond D, it was driven by a retaliatory motive or by some other nefarious purpose. Rather, it is uncontested that the DOL initiated its wage investigation in response to the written allegations of underpayments made by Diamond D employees, pursuant to its statutory duties under New York's valid prevailing wage law. And Diamond D has not demonstrated that the DOL singled it out for adverse treatment. To the contrary, the district court found, "there is no credible allegation that the DOL is incompetent by reason of bias to adjudicate the withholdings issue...." *Diamond "D" III*, 142 F.Supp.2d at 399 (internal quotation marks omitted).

Diamond D's complaints concerning the DOL's delays in scheduling post-deprivation hearings and the amount of the DOL's withholdings, interest, and civil penalties go to the manner in which the administrative proceedings were conducted; they do not speak to the subjective intent of the DOL in commencing the prevailing wage proceedings. On that score, the district court never concluded and Diamond D has not demonstrated that the DOL's proceedings were brought with an intent to harass or any other illegitimate motive.

We therefore are left with a case that bears little resemblance to *Cullen*, and its "strictly *ad hominem*" retaliatory disci-

plinary proceeding, 18 F.3d at 104, but rather looks more like *Schlagler*, a prosecution motivated principally by "a straightforward application of the laws of New York," 166 F.3d at 443. For that reason, we hold that the bad faith exception has no application on these facts.

## 2. Extraordinary Circumstances

The Supreme Court attempted to breathe meaning into the second *Younger* exception as follows:

> Only if "extraordinary circumstances" render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process. The very nature of "extraordinary circumstances," of course, makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention in state criminal proceedings. But whatever else is required, such circumstances must be "extraordinary" in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation.

*Kugler*, 421 U.S. at 124–25, 95 S.Ct. 1524 (footnote omitted). While *Kugler* spoke in the context of criminal prosecutions, the same standard applies in the civil context. *Moore v. Sims*, 442 U.S. 415, 433, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979).

Only twice has the Supreme Court provided examples of circumstances that would meet this high standard: first, when a state statute is " 'flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it,' " *Younger*, 401 U.S. at 53–54,

91 S.Ct. 746 (quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)); and later, when the state administrative agency "was incompetent by reason of bias to adjudicate the issues pending before it," *Gibson v. Berryhill*, 411 U.S. 564, 577, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Clearly, neither of the Supreme Court's examples fits this case: there is no argument before us that the prevailing wage law is unconstitutional on its face. Moreover, the district court specifically found that the DOL had no bias against Diamond D. *Diamond "D" III*, 142 F.Supp.2d at 399.

So we are left with the definition first set out in *Kugler*, and its two predicates for application of this exception: (1) that there be no state remedy available to meaningfully, timely, and adequately remedy the alleged constitutional violation; *and* (2) that a finding be made that the litigant will suffer "great and immediate" harm if the federal court does not intervene. *Trainor v. Hernandez*, 431 U.S. 434, 441–42 & n. 7, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Given these requirements, we must ask, as the district court did, "whether extraordinary circumstances can be seen in the fact that Diamond D's viability as a business [was] being imminently threatened by the DOL's arbitrary withholdings and by the undue delays that have been associated with the investigation and the hearing process." *Diamond D III*, 142 F.Supp.2d at 399.

The district court concluded that exceptional circumstances were present because: (1) there was no state process that could remedy the alleged constitutional violation in a timely manner; and (2) the imminent destruction of Diamond D's business was a "great and immediate" harm that justified injunctive relief. *Id.* at 399–401. We disagree with the first conclusion and thus

find that application of this exception was not appropriate.

It is significant that to the extent that the DOL was dragging its feet, Diamond D was free to file a mandamus proceeding in the Appellate Division to compel the DOL to provide expeditious post-deprivation review as required by the prevailing wage law. Indeed, the district court specifically noted that, *"[j]udicial review was available because Diamond D could have gone to the State courts at any time during the pendency of the DOL investigation and sought a writ of mandamus...."* *Diamond "D" II*, 110 F.Supp.2d at 207 (emphasis in original). Again, where such state remedies are available, "a federal court should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil v. Texaco*, 481 U.S. 1, 15, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). We therefore need not and do not determine whether, absent the availability of such remedy, the threat to Diamond D's survival would warrant invocation of the "exceptional circumstances" exception to *Younger* abstention.

## CONCLUSION

We have considered all of the parties' remaining contentions and find them to be without merit. Under *Younger*, the district court should have abstained from taking jurisdiction over this claim for injunctive relief. For that reason and those foregoing, we VACATE the order of the district court and REMAND this case for further proceedings on Diamond D's remaining damages claims.

SO ORDERED.